### DE LAMAR v. DE LAMAR MIN. CO., Limited.

(Circuit Court of Appeals, Ninth Circuit. June 6, 1902.)

#### No. 774.

1. PATENTS—ANTICIPATION—PROCESS FOR RECOVERING METALS FROM SOLUTIONS.

The Waldstein patent, No. 607,719, for a process for extracting precious metals from cyanide solutions by the use of zinc dust as a precipitating agent, and the agitation of the solution until the precipitation is complete, is void for lack of invention and anticipation; every step in the process having been disclosed in prior patents and publications. The additional feature of claims 2 and 3, in requiring the use of a "definite quantity" or the "exact quantity" of zinc dust sufficient to precipitate the contained metals, does not render the process patentable, since the proper proportion is not given, nor the means for ascertaining it; and, conceding that such fact does not render the claims fatally defective, the patentee not being the inventor of the use of zinc dust by means of agitation as a precipitating reagent, the public is free to use such quantity as may be required to best produce the desired result.

Appeal from the Circuit Court of the United States for the District of Idaho.

For opinion below, see 110 Fed. 538.

Dickson, Ellis & Ellis, for appellant.

John H. Miller, Richard Z. Johnson, and Richard H. Johnson, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This suit was brought for the alleged infringement of certain letters patent, No. 607,719, and issued July 19, 1898, for an alleged invention, by one Waldstein, for "certain new and useful improvements in processes for the recovery of precious metals from their solutions." The relief sought was an injunction, an accounting, and damages. Among the defenses set up by the answer of the defendant were lack of novelty and invention, anticipation, no infringement, and a want of sufficient description of the alleged invention. The court below held the patent void, and the case is brought here by the plaintiff.

The invention claimed being only for improvements in well-known processes, and in no sense one of a pioneer character, the patentee must be held to a strict construction of his claims. Wright v. Yuengling, 155 U. S. 47, 15 Sup. Ct. 1, 39 L. Ed. 64; Westinghouse v. Power-Brake Co., 170 U. S. 562, 18 Sup. Ct. 707, 42 L. Ed. 1136.

The specification and claims of the patent are as follows:

"My invention relates to the recovery of the precious metals from their solutions by the use of definite quantities of a finely divided precipitating reagent in a state of agitation. In this specification, wherever I use the term 'zinc' I mean to be understood as referring, not only to zinc from which all impurities have been removed, but also to commercial zinc, which ordinarily contains a small percentage of other metals, such as lead, bismuth, arsenic, cadmium, and antimony. Zinc and zinc alloys and amalgams in the form of shreds, threads, turnings, shavings, and granules have heretofore been used as precipitating reagents in processes for the recovery of precious metals from their ores where an aqueous solution of a cyanide has been used as a solvent for the contained minerals, but in all those various forms the zinc must necessarily be supplied in excess of the quantity actually required for the precipitation, inasmuch as, means not having been heretofore provided for keeping the divided zinc in a state of agitation, each fiber of the filtering-mass must contain a sufficiency of the metal to give to it such an amount of stability as will resist the compression of the flowing solution. Otherwise, the comminuted zinc packs closely, and either prevents the passage of the solution altogether, or separate channels are formed in the compressed mass, through which the solution flows without coming in contact with the intervening mass. In the manufacture of zinc products, there is evolved as a by-product a very fine powder known as 'zinc dust,' which has very little commercial value. It is therefore very cheap, and is in the most desirable form for precipitating purposes, as it can be supplied in exactly the quantity which the metals in the solution may require; thus doing away with the difficulty heretofore experienced of fouling the solution, which always occurs where an excess of zinc is provided, as has heretofore always been done. In the practical manipulation of ores the solution, after the metals have been precipitated from it, still contains a large amount of the original solvent, which can be utilized for the treatment of fresh ore. It is therefore important that the solution so reused should not contain any zinc. In the practical working of my process, the ores are first subjected to the action of an aqueous solution of the solvent. It is then drawn off into another receptacle, and a test is made to determine the exact quantity of zinc dust which that body of solution requires. The solution is then drawn off into a precipitating-tank, and the predetermined amount of zinc dust is added to the solution. In its finely divided state, the zinc dust would settle to the bottom of the precipitating-tank, and effectually resist the percolation of the solution. Therefore, I provide for the precipitating-tank a revolving shaft, to which are attached one or more paddles or agitators, which, being set in motion, disperse the zinc dust throughout the whole mass of the contained solution; the agitation being continued until all the minerals in the solution have been precipitated. The solution is then ready for regeneration, and subsequent reuse, without being fouled or tainted by the presence of unabsorbed zinc. The valuable precipitate is then passed through a filtering-press, and the precious metals recovered according to well-known processes. I do not claim pulverized or mechanically divided zinc. I only claim zinc dust. Zinc dust, or, as it is sometimes known in the markets, 'zinc fumes', is the material which is found in the prolongation of the condenser in the distillation of zinc for the manufacture of various zinc products, such material resulting from a cooling of a portion of the zinc while in a state of vapor. It is an admixture of metallic zinc and zinc oxid. Wherever I use the term 'zinc dust' in this application, I refer to zinc and zinc oxid produced in the manner above described, or by some equivalent process, and, therefore, what I do claim as my discovery, and desire to protect by letters patent,

117 F.—16

is: (1) The process of extracting precious metals from cyanide solutions, which consists in treating said solutions with zinc dust, to wit, the herein-described material, composed of zinc and zinc oxid, in a state of agitation substantially as described. (2) In the process of extracting precious metals from cyanide solutions, the use, as a precipitating reagent, of a definite quantity of zinc dust in a state of agitation, the quantity of said zinc dust being supplied in only a sufficient quantity to thoroughly precipitate the contained metals, substantially as described. (3) The process for extracting and recovering precious metals from their ores, and which consists essentially of the following steps: First, subjecting the ore in a powdered state to the action of an aqueous solution of a cyanide; second, supplying to the solution charged with the precious metals that quantity of zinc dust determined to be exactly sufficient to precipitate said metals; third, agitating said solution and said zinc dust until said metals are precipitated, and said zinc dust is absorbed; fourth, recovering the precious metals from the valuable precipitate of the preceding step by filtration, or other process, substantially as described."

It is thus seen that what is first claimed by the appellant is zinc dust in a state of agitation; second, a definite quantity of zinc dust in a state of agitation, sufficient only in quantity to thoroughly precipitate the contained metals; and, by the third claim, the process for extracting and recovering precious metals from their ores, consisting of certain specified steps, the first and fourth of which are beyond all question old, and the second and third of which steps consist in supplying to the solution charged with the precious metals the exact quantity of zinc dust ascertained (without telling how) to be sufficient to precipitate the said metals, and agitating the solution and zinc dust until such metals are precipitated, and the dust absorbed. The record shows that in an affidavit filed in the patent office by Waldstein, November 30, 1897, in support of his application for a patent, it is stated that he made his discovery "on or about the 15th day of July, and not later than the 15th day of August, 1894." It is not pretended that he discovered zinc dust. And although we find in the specification the words, "I do not claim pulverized or mechanically divided zinc; I only claim zinc dust," the very next clause of the specification itself shows, what other portions of the record abundantly establish, that zinc dust, or zinc fumes, as it is also called, had long been a well-known article of commerce, being a product resulting from the cooling of zinc while in a state of vapor. Indeed, in the brief of counsel for the appellant is the express declaration: "We do not pretend that Waldstein invented or discovered zinc dust, nor do we claim that he invented the atomic weight theory, or that he invented agitation. This fallacy permeates the argument against the patent throughout." It may be added with equal truth that he did not invent the theretofore well-known cyanide solution, consisting of an aqueous solution of cyanide of potassium, with which pulverized ores are, and for many years before Waldstein's time had been, treated for the purpose of extracting the metals therefrom. The record shows that the use of zinc in various forms, for precipitating copper and the precious metals from cyanide solutions, was well known in the art long before Waldstein's alleged discovery. As early as April 21, 1866, the Scientific American, of New York, being asked how to recover gold from a plating solution which was spoiled by adding, direct, a nitro-muriate solution of gold to the common cyanide solution, published the following answer:

"The bath is probably not injured. To recover the gold, put stick of bright zinc into the solution. Zinc will precipitate gold from any solution."

The Paraf-Javal patent, issued in France, July 31, 1866, No. 72,466, shows that zinc was not only then known and used in the art of precipitating metals, but that form of it known as zinc dust, and that, the finer the metal used as the precipitant, the better the result. In the description in that patent, which was for "improved chemical processes," it is said:

"To obtain the metals in a powdered form, they are precipitated from their solutions by other metals, such as zinc, iron in bars, ingots, sheets, or particles larger or smaller in size. I obtain the best results by making the precipitation with the metals in a powdered state. The finer the powder, the better the result. If I wish to obtain tin in the form of a powder, I take the solution of a tin salt,—for example, protochloride of tin more or less concentrated; for example, 1:B,—and I dilute the same very slowly with zinc dust, iron dust, etc., stirring the same sufficiently. * * * There are a thousand methods of using zinc dust in dyeing with indigo. * * *"

In the Paraf English patent of August 1, 1866, for "improvements in deoxidation and precipitation," it is said:

"I replace the usual reductors entirely or partially by zinc, using by preference this metal in the impalpable state,—one or two parts of zinc; two or four parts of quick lime; three to four parts of indigo have given me very good results,—the usual mode of working being employed. I also find that zinc in powder reduces metals in finer powder than in plates or grains, and I reserve to myself the use of metals in powder for the precipitation of metals."

An English patent, No. 10,223, and issued July 14, 1888, to Mac-Arthur and Forrest, for "improvements in extracting gold and silver from ores or other compounds," sets out their method of treating a cyanide solution containing gold and silver by causing it to pass through a mass of metallic zinc in a state of fine division. In the patent issued by the United States to MacArthur and Forrest December 24, 1889, and numbered 418,137, for a "process for separating gold and silver from ore," in which the cyanide process is used as the separating agent, it is said:

"The cyanide solution containing the gold or silver is next made to pass through a sponge of zinc, whereby said metal is precipitated from the solution, and retained in the sponge. The zinc sponge is preferably composed of fine threads or filaments of zinc. These zinc threads are formed in shavings cut by a turning-tool from a series of zinc disks held in a lathe; or the sponge may be formed by passing molten zinc at a temperature just above the melting point through a fine sieve, and allowing it to fall into the water. The sponge thus formed presents a very large contact surface for the solution, and it does not become easily choked."

In an article published in the Engineering and Mining Journal, of New York, on the 6th day of August, 1892, it was said, in referring to the MacArthur-Forrest patents:

"It is possible that the special experience acquired by the company holding these patents may be of value to those introducing the process, but it appears certain that the use of both cyanide of potassium in solution for dissolving gold and silver, and of finely divided zinc for precipitating them from those solutions, were well known long before the MacArthur-Forrest patents were granted or applied for, and that the process can therefore be used without liability for payment of any patent right or royalty."

In an article entitled "Mixed Metals or Metallic Alloys," by Arthur H. Hiorns, the date of which publication does not appear from the record, but is said in one of the briefs to have been in 1890, reference is made to the fact that zinc displaces gold, silver, and other metals from their solution; and it is said that "in the form of fine dust it is obtained in large quantities, mixed with zinc oxide, and forms a valuable reducing agent." Not only was zinc dust here, and in some of the previous references, distinctly suggested as a precipitant of the precious metals from their solutions, but throughout the testimony on both sides of this case it is shown that in such precipitation the chemical action is purely a surface one, and, therefore, it required but the exercise of ordinary common sense to know that, the larger the surface of the precipitant, the quicker and more effective must be the precipitation. This fact is distinctly admitted by Waldstein himself, in his deposition, where he says:

"The object of the zinc being to reduce the gold from its solution to its metallic state by the action of zinc on the double salt of cyanide of potassium and cyanide of gold, it is very natural that, the larger surface of zinc that would come in contact with the solution containing the gold would be, the quicker action. Therefore, the first use of zinc in plates was changed into the use of shreds or small particles of zinc. This very fact that this was done led me to my discovery that, if I could put the full surface of zinc contained in zinc dust in the finest possible division, I would achieve the desired result more fully."

D. K. Tuttle, a witness called by the appellant, and at the time of giving his deposition a melter and refiner in the mint of the United States at Philadelphia, having stated that zinc turnings were usually employed in the precipitation of the precious metals from cyanide solutions, and being asked why the turnings were used instead of sheet zinc, answered:

"The reason, as I understand it, is the increase of surface,—an attempt, in other words, to approach, as near as they can, a greater state of division, as the action is purely a surface one. X. Q. 33. That is to say, the greater the exposed surface of the zinc, the greater the precipitation of the precious metal? A. The more rapid and complete the precipitation of the precious metal. X. Q. 34. This has been known to the art a great many years, hasn't it? A. It has. X. Q. 35. For how long to your knowledge? A. So far as I know, as far back as one metal has been used to precipitate another. The only improvements that I know to have been made were in the direction of getting a still finer state of division than was previously known."

This witness, being questioned in regard to his metallurgical experiences, further testified as follows:

"I have precipitated solutions with metal in a more or less massive state; I have precipitated it with the same metal in a very finely divided form. Common sense tells me that what is true in this case is true in another parallel case. X. Q. 28. I do not quite understand the latter part of your answer. What is true in the one case, that follows in the other? A. I will explain by illustrating. I have precipitated gold from its solution with sheets of copper, but in a very much less time, and much more effectively, by what is called 'cement copper,' being practically copper dust. If I had gold to precipitate with sheet zinc, I should treat it as a 'parallel case,' preferably, with zinc dust. X. Q. 29. You mean, I suppose, that, if the copper dust is more effective in the one case, zinc dust will be more effective in the other? A. The two reactions being so similar in character that I should certainly ex-

pect the zinc dust to be as superior to the zinc sheet as the copper dust was to the copper sheet."

Zinc dust, it is shown, is composed almost entirely of metallic zinc and zinc oxide. Whether the oxide causes the formation of an electric or voltaic couple in the solution, thereby facilitating precipitation, as contended on behalf of the appellant, or retards it, as claimed for the appellee, we regard as unimportant. The fact remains, as is very clearly shown by the foregoing references, and by others appearing in the record, that at the time of, and for many years prior to, Waldstein's alleged discovery, zinc dust was well known, not only as a precipitant of the precious metals from a cyanide solution, but that it was regarded, by some at least, as the best form in which zinc could be used for that purpose. Neither the article itself, nor its precipitating character, could, therefore, have been discovered by Waldstein in 1894. And the record shows that it was just as well known at that time that agitation of the solution during the application of the dust would expedite and facilitate the precipitation of the metals.

In Fresenius' Chemical Analysis, published in 1850, it is said:

"We may generally promote the separation of a precipitate by strongly agitating the menstruum, and also by elevating its temperature."

In Kustel's treatise on Roasting of Gold and Silver Ores, published in 1880, it is said:

"When the solution coming from the leaching vats rises to within eighteen or twenty inches from the rim of the vat, the flow is turned into the next vat, and the precipitation of the first one commences immediately. For this purpose, a bucket full of the sulphide of calcium is poured into the vat, and the silver precipitated. The solution is then stirred violently. * * * The precipitation is performed in a short time, requiring about fifteen minutes for each tank. The stirring must be executed with vigor."

And referring to the precipitation of gold in the chlorination process, the same author says:

"One bucket of this solution, or less, according to the richness of the ore, is poured into the precipitating tub, and the liquid stirred well."

In the Metallurgy of Silver, Gold, and Mercury, published in 1887 by Thomas Egleston, he refers to the use of a paddle to stir the solution by hand, but says:

"Mechanical agitators should be used to make the mixture perfect; these can be arranged so as to be worked with but little expense."

In an article published in the Industrie-Blätter, at Berlin, Germany, August 23, 1890, we find the following:

"As excellent as the zinc sheets or the combined zinc iron sheets are for the separation of the silver from the silver containing cyanide of potassium solutions, yet it cannot be used for the separation of the gold from the used gold bath solution. In this case the gold precipitates very imperfectly, and then as a closely adhering glossy coating on the zinc. On the other hand, finally [finely] divided zinc,—the so-called 'zinc dust,'—is a preferable means by which to precipitate the gold quantitatively and in a powdered form from its cyanide of potassium solutions. If zinc dust is put into an old used cyanide of potassium gold bath, and from time to time shaken or stirred, then within two or three days all the gold is precipitated. The quantity of zinc necessary for the precipitation is regulated, of course, by the quantity of gold present. * * * Since the precipitation by an excess

of zinc dust proceeds more rapidly, it is well to use, in general, for every 100 liters of old gold bath, ¼, at most ½, kilogram zinc dust."

In an article published in the Berg-Und-Huettennmaenische Zeitung, at Leipsic, Germany, October 17, 1890, it is said:

"For precipitating gold: Agitate the mixture with zinc dust, taking, for 100 liters of used gold bath, ¼ to ½ kilograms of zinc dust; freeing the gold from the zinc by hydrochloric acid, from silver and copper by nitric acid."

In the chemical magazine called "Chemiker-Zeitung," published at Cothen, Germany, October 29, 1892, the publisher said:

"According to my experiments, every interested person is easily in a position to recover the gold from cyanide of potassium liquids with the aid of zinc dust. After repeatedly shaking, and eventually allowing the same to remain stationary for a time, the gold is entirely precipitated, so that it cannot be qualitatively detected any more in the mother solution. Zinc in compact form cannot be substituted for the zinc dust. For cyanide of potassium silver solutions, zinc sheets or zinc and iron sheets will answer the purpose."

An English patent, No. 5,152, was issued October 29, 1883, to Astley Paston Price, for "improvements in the extraction of the precious metals from their ores, and from metallurgical compounds or products containing the same," in which his claim was as follows:

"Effecting the precipitation and separation of the precious metals videlicet of gold or of silver, or of gold and silver, from solutions resulting from the treatment substantially as hereinbefore mentioned, or otherwise of ores or of metallurgical products such as, or similar to, those hereinbefore referred to, by the employment, when in a fine state of division, of zinc or of other metal or metals, other than copper, which are capable of precipitating either gold or silver, the same being brought into contact with the solution, and maintained in contact therewith, by means of agitation effected either as hereinbefore mentioned or otherwise."

Within a month thereafter, to wit, November 16, 1883, the United States issued to Price a patent for "improvements in obtaining copper from cupreous solutions," in which the specification states, among other things, that the invention consists "in effecting the precipitation of the copper from its solution or solutions by the employment of zinc when in a state of fine division, such, for example, as that which is known as 'zinc fume' or the 'condensed vapor of zinc.'" In his specification, Price there further said:

"In carrying out my invention, I add, to the solution or solutions containing copper, zinc in a state of fine division, such as zinc fume, which is substantially metallic zinc in a state of fine division, and I cause the cupreous solution or solutions to be intimately mixed with the same either by the injection of steam or of air, or by mechanical agitation, in order that the copper existing in solution may be precipitated therefrom."

It is perfectly plain that the process here described, of using zinc dust or fume with mechanical agitation for the precipitation of copper, is the identical process stated in the first claim of the Waldstein patent for precipitating gold and silver. The latter was nothing more than the application of that old process to analogous matter, producing a result substantially similar in its nature, and was therefore entirely lacking in invention. Ansonia Brass & Copper Co. v. Electrical Sup-

ply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Manufacturing Co. v. Cary, 147 U. S. 623, 637, 13 Sup. Ct. 472, 37 L. Ed. 307.

It is contended on the part of the appellant that the quantity of such dust to be so used is covered by claims 2 and 3 of the Waldstein patent. Claim 2, as has been seen, is for a definite quantity of zinc dust in a state of agitation, sufficient only in quantity to thoroughly precipitate the contained metals, and claim 3 is for the exact quantity of zinc dust ascertained to be sufficient to precipitate the said metals, agitating the solution and zinc dust until such metals are precipitated and the dust absorbed. Ascertained how? No proportions are given, and, indeed, not a word is said in the patent from which any one desiring to use the process described therein can determine the "definite quantity" referred to in the second, or the "exact quantity" referred to in the third, claim of the patent in question. In the absence of specific information upon the subject, the desired quantity can, in the nature of things, only be determined by experiment.

Section 4888 of the Revised Statutes provides:

"Before any inventor or discoverer shall receive a patent for his invention or discovery, he shall make application therefor, in writing, to the commissioner of patents, and shall file in the patent office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. The specification and claim shall be signed by the inventor and attested by two witnesses."

"The object of this," said the supreme court in the case of In re Incandescent Lamp Patent, 159 U. S. 465, 474, 16 Sup. Ct. 75, 78, 40 L. Ed. 221, "is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid. Grant v. Raymond, 6 Pet. 218, 247, 8 L. Ed. 376. If the description be so vague and uncertain that no one can tell, except by independent experiments, how to construct the patented device, the patent is void. It was said by Mr. Chief Justice Taney in Wood v. Underhill, 5 How. 1, 5, 12 L. Ed. 23, with respect to a patented compound, for the purpose of making brick or tile, which did not give the relative proportions of the different ingredients: 'But when the specification of a new composition of matter gives only the names of the substances which are to be mixed together, without stating any relative proportion, undoubtedly it would be the duty of the court to declare the patent void. And the same rule would prevail where it was apparent that the proportions were stated ambiguously and vaguely. For in such cases it would be evident, on the face of the specification, that no one could use the invention without first ascertaining, by experiment, the exact proportion of the different ingredients required to produce the result intended to be obtained. * * * And if, from the nature and character of the ingredients to be used, they are not susceptible of such exact description, the inventor is not entitled to a patent.' So in Tyler v. Boston, 7 Wall. 327, 330, 19 L. Ed. 93, wherein the plaintiff professed to have discovered a combination of fusel oil with the mineral and earthy oils, constituting a burning fluid, the patentee stated that the exact quantity of fusel oil which is necessary to produce the most desirable compound must be determined by experiment. And the court observed: 'Where a patent is claimed for such a discovery, it should state the component parts of the new manufacture claimed with clearness

and precision, and not leave a person attempting to use the discovery to find it out "by experiment." ' "

See, also, Mitchell v. Tilghman, 19 Wall. 287, 394, 22 L. Ed. 125; Béné v. Jeantet, 129 U. S. 683, 9 Sup. Ct. 428, 32 L. Ed. 803; Howard v. Stove Works, 150 U. S. 164, 167, 14 Sup. Ct. 68, 37 L. Ed. 1039; Schneider v. Lovell (C. C.) 10 Fed. 666; Welling v. Crane (C. C.) 14 Fed. 571; Lockwood v. Faber (C. C.) 27 Fed. 63; Chemical Rubber Co. v. Raymond Rubber Co., 18 C. C. A. 31, 71 Fed. 179.

We are unable to see any invention in anything disclosed by the Waldstein patent, and must therefore affirm the judgment of the court below. The real inventor is undoubtedly to be encouraged, and the courts should always be careful to protect his rights; but it was never the intention of the patent law to give a monopoly to a mere follower of the knowledge and ingenuity of others. The judgment is affirmed.

GILBERT, Circuit Judge, with whom concurred MORROW, Circuit Judge. While concurring with the conclusion that the decree of the circuit court should be affirmed, and agreeing with that part of the opinion which holds that claim 1 of the patent of appellant is for an old process applied to a new use, we are unable to assent to the conclusion that claims 2 and 3 are fatally defective for the reason that no proportions are given, and nothing is said in the patent from which one desiring to use the process can determine the "definite quantity," or the "exact quantity," referred to in those claims. We are not prepared to say that, in a patent for a process such as described in the appellant's claims, the inventor might not be protected in the use of his process if, from the very nature thereof, it would be impossible to state in his claims the precise quantity of material necessary to accomplish the desired result. From the nature of the appellant's process, and the varying conditions under which it must necessarily be applied in practical mining, it is apparent that the appellant, if he were the inventor of a new and useful method of applying zinc dust to a precipitation of precious metals from cyanide solution, could publish no definite formula for his process. The best that he could say would be that his process required the use of such a quantity as, from experiment or analysis of varying ores, would be found in each case to be the requisite amount for complete precipitation. We think, as did the court below, that, to one skilled in the art to which the patent refers, the information afforded by the claims would be sufficient. But we think that the nature of claims 2 and 3 is such as to be incapable of protection by patent. The appellant was not the inventor of the use of zinc dust, by means of agitation, for the purpose described in his claims. That use being already known in the art, his patent is left to rest upon his claim of the use of a definite quantity. This claim, we think, cannot be made the subject of patent. Conceding that the appellee and others had the right to use zinc dust, and to use it by means of agitation, it must follow that they would have the right to use such quantity as would best accomplish the result desired. The appellant cannot take from them that right, or the right to experiment, and adjust the quantity of material, by asserting that he is the first discoverer of the use of a definite quantity, or the exact quantity,

which will precipitate all the mineral in the solution. If all the claims of his patent are good, it follows that others can only avoid infringement by using zinc dust in an unskillful way, by either using too much or too little. The right to use the dust being free to all, we think it follows, necessarily, that all have the right to adjust the quantity of the material to the necessities of each case, and to ascertain by experiment or analysis, if need be, the quantity that may be required to produce the desired end, and that such a use cannot be made the subject of monopoly, there being involved in it no discovery, but only the exercise of ordinary prudence and skill.