**BELLIS HEAT TREATING CO. v. HEAT-BATH CORPORATION et al.**

Circuit Court of Appeals, First Circuit.
January 6, 1928.

No. 2145.

1. Patents ⬚328—1,491,510, involving application of eutectic, or lowest melting point of salts, in salt baths for tempering and hardening steel, held anticipated and void.

Patent No. 1,491,510, for salt baths for tempering and hardening steel, involving mixing of salts at lowest melting point, called the eutectic, without designation of particular components to be used in mixture, *held* anticipated, and void for want of invention.

2. Patents ⬚16—No invention results from making use of another's teaching.

Invention does not result from merely making use of another's teaching, since nothing new is involved.

3. Patents ⬚328—1,520,744, for mixture of potassium chloride and sodium carbonate in tempering and hardening steel, embodying eutectic principle, held void.

Patent No. 1,520,744, for an essentially non-hygroscopic eutectic mixture of potassium chloride and sodium carbonate in salt baths for tempering and hardening steel, based on principle of eutectic or lowest melting point of salts, *held* void for want of invention.

Appeal from the District Court of the United States for the District of Massachusetts; Elisha H. Brewster, Judge.

Patent infringement suit by the Bellis Heat Treating Company against the Heatbath Corporation and others. Decree for defendants, and plaintiff appeals. Affirmed.

C. P. Goepel, of New York City, for appellant.

Chester T. Neal, of Springfield, Mass., and Marcus B. May, of Boston, Mass., for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. [1] The controlling question in this patent infringement suit is as to the validity of the patents sued upon—No. 1,491,510, issued April 22, 1924, and No. 1,520,744, issued December 30, 1924. The court below (Brewster, J.) held both invalid, in an able and exhaustive opinion, which is in the record, but unfortunately is not reported. If it had been reported, the case might well be disposed of by adopting it as the opinion of this court. But we use it freely in stating our conclusions. The appellant, by 24 assignments, challenges Judge Brewster's findings, as well as his conclusions.

The patents are for salt baths for tempering and hardening steel. Arthur E. Bellis, a graduate of the Massachusetts Institute of Technology in 1913, is the alleged inventor. After service as a metallurgist with the Westinghouse Company and for the United States at the Watertown Arsenal, he entered the Springfield Armory in 1917 to direct the metallurgical work there during the war.

The defendant Walen was associated with Bellis and one Collins in the studies and tests that led up to the alleged inventions; he is now the chief factor in the defendant cor-

poration, which is competing with the plaintiff in the manufacture and sale of salt baths. Walen uses three ingredients, and his formulæ are otherwise somewhat different from those of the plaintiff, who uses but two ingredients.

Steel is iron with $^{15}/_{100}$ of 1 per cent. to 1½ per cent. of carbon added. When heated and then cooled, a molecular change occurs, with resultant hardening and toughening. Of course, tempering is a very old art. How the traditional finely-tempered Damascus blades were treated, this record does not disclose. The blacksmith, with his forge and water trough, is a familiar, old-fashioned steel maker. But now, as this record shows, there are some 150 different kinds of steel, as compared with 12 to 15 kinds 50 years ago. Methods of tempering have also increased. Ovens and furnaces of various kinds, baths such as lead, cyanide, and combinations of salts, have all been used for many years. One of the plaintiff's witnesses testified that many kinds of salt baths had been used long before he was born, and that other salt baths besides the plaintiff's and the defendant's are now on the market. There is no merit in the plaintiff's twenty-first assignment, that the District Court erred in failing to hold that the evidence showed that the salt baths of the prior practical art were commercial failures and had been discarded. There is no such showing of striking commercial success in solving a troublesome problem as to tip the balancing scale in plaintiff's favor. Eibel Process Co. v. Minn. & Ontario Paper Co., 261 U. S. 45, 53, 43 S. Ct. 322, 67 L. Ed. 523; Respro, Inc., v. Sydeman (D. C.) 11 F.(2d) 779; Inland Mfg. Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657.

We turn to the first patent, No. 1,491,510. The application for this was filed by Bellis September 28, 1920. It "relates to a fused eutectic salt bath," to be used in the heat treatment of metals and for other purposes. The specification sets out:

"The essential and distinguishing characteristic of a eutectic mixture of two or more components is recognized as that particular proportionate mixture of the components which possesses the lowest melting point, and is therefore the most fusible mixture of such components.

"My present invention, therefore, has for its primary object to provide such a eutectic fused salt bath, which, in addition to its low melting point, will have a relatively high volatization point, and thus afford a relatively wide range of temperatures, in which the mixture of the components will have its greatest fluidity, and in which the components of such mixture will, at all times, remain in the original eutectic proportions in both solid and liquid phases. Owing to the fact that such maximum fluidity is obtained in the eutectic mixture, there is a rapid and uniform circulation of heat throughout all parts of the bath, so that the metal object being treated will be uniformly heated throughout its structure. Also, the low viscosity of the bath minimizes the thickness of the bath film which adheres to the object when it is withdrawn, so that there will be a relatively small loss of the bath material."

After an elaborate explanation of accompanying diagrams, representing mixtures of salts, Bellis proceeds:

"The melting point curves of the components in different relative proportions are plotted, as indicated by the diagrams, and from these plotted curves the eutectic proportions of the components having the lowest melting point and the greatest fluidity through a relatively wide range of temperatures may be determined. The eutectic mixture of the two components is then made in these proportions and thoroughly melted. The correctness of the eutectic may be confirmed by the use of pyrometers, to determine that solidification of the fused mixture occurs at a constant temperature, which is below the melting temperatures of the individual components. This complete fusion of the components and the complete transformation from the liquid to the solid phase without change in temperature is the only absolute proof of the fact that a eutectic mixture has been obtained."

Here is a warning that the charts are not to be absolutely relied upon.

Bellis then asserts that the eutectic may be comprised of three or more components. He states but two examples of eutectic salt baths: A mixture of sodium chloride (common salt), 39 per cent.; and sodium carbonate (soda) 61 per cent.; and a mixture of calcium chloride, 71 per cent., and sodium chloride, 29 per cent. His commercial bath, "Lavite," corresponds to neither of these examples. Bellis says it is potassium nitrate, 56 per cent., and sodium nitrate, 44 per cent. But he says in his patent that the proportions must vary slightly with the degree of impurity present. He emphasizes the breadth of his alleged invention by saying:

"It is to be understood that the example of a eutectic salt bath mixture to which I have above made reference is merely suggestive, and that it is possible to devise numerous other mixtures in which the working tem-

perature may vary through a considerable range; such temperature ranges, of course, differing for the different chemical components of the individual baths, and as may be determined from practical experience to be most desirable for the particular object in view."

This falls little short of saying that, after all, "practical experience" must be the real test of efficiency.

Also:

"It is accordingly to be borne in mind that I do not consider myself at all limited in the practical use of my present invention to a eutectic mixture of the character which I have mentioned, or to mixtures having the precise melting or freezing points referred to, since the nature of the bath components and the relative proportions thereof, which determines the eutectic temperature, are susceptible of more or less variation. Therefore the privilege is reserved of adopting all such legitimate modifications as may be fairly embodied within the spirit and scope of the invention as claimed."

He makes eight claims; Nos. 1, 2, and 4 are sufficiently illustrative:

"(1) A metal heat-treatment bath of fused chemical salts characterized by a single liquid phase at any temperature above the freezing point, and a single solid phase at any temperature below the freezing point.

"(2) A metal heat-treatment bath of fused chemical salts characterized by the presence of both the liquid and solid phases only at one predetermined temperature, and a single liquid phase at all temperatures above the said predetermined temperature."

"(4) A metal heat-treatment bath consisting of a plurality of fused chemical components, said bath having a freezing temperature below the freezing temperature of any one of its individual components, and said bath at a temperature above the freezing temperature thereof forming a single non-conjugate liquid."

The claims are by defendant's counsel all properly characterized as vague and mysterious.

The learned District Judge pertinently observes that the validity and limits of this patent must be considered in the light of certain well-known scientific principles and continues:

"A mixture of two salts may be classified under the headings of compounds, solid solution systems, or eutectic systems. If the salts combine with one another chemically, so that the resulting product is a single substance, differing from either of the components, this result is a compound. If, however, the salts are completely soluble in one another in the solid as well as the liquid state, we have what is known in science as the solid solution system, and if the salts are completely soluble in one another in the liquid state, but insoluble in the solid state, we have what the chemist calls the eutectic system.

"The lowest melting point of salts of the eutectic system is called the 'eutectic,' and the lowest melting point of salts belonging to the solid solution system is called the 'minimum.' Plaintiff's expert gave a short working definition of the word 'eutectic' as 'that mixture of two substances—they may be metals; they may be salts—which, when combined together, have the lowest melting point.'

"If full scope is given to the language of Bellis' application, he sought an exclusive right during the life of his patent to mix two or more substances suitable for heat-treating metal in such proportions as will give the lowest melting point, namely, the eutectic or the minimum of solid solutions. If the patent be upheld as valid, the defendant cannot manufacture and sell for heat treatment of steel, nor can a manufacturer use for that purpose without plaintiff's consent, any combination of two or more salts or other suitable ingredients, if the proportions in which the components are used should give the lowest melting point of any combination of such salts. The claims are not for a product particularly described, composed of specified constituents or of constituents mixed in a specified proportion. Nor is there any claim for any specified device for, or any method of, mixing the ingredients. The claims are sufficiently broad to cover any and all proportions of any and all constituents which are now known, or which some scientist may hereafter find, to be useful for heat-treating steel, provided such proportions yield the lowest melting point of the combination."

We see no escape from this analysis of the patent.

The learned District Judge also quotes as pertinent from De Lamar v. De Lamar Min. Co., Ltd., 117 F. 240, at page 248, where the court (C. C. A. 9th) was dealing with a method of recovering precious metals by the use of zinc dust:

"The appellant was not the inventor of the use of zinc dust, by means of agitation, for the purpose described in his claims. That use being already known in the art, his patent is left to rest upon his claim of the use of a definite quantity. This claim, we think, cannot be made the subject of patent. Con-

ceding that the appellee and others had the right to use zinc dust, and to use it by means of agitation, it must follow that they would have the right to use such quantity as would best accomplish the result desired. The appellant cannot take from them that right, or the right to experiment, and adjust the quantity of material, by asserting that he is the first discoverer of the use of a definite quantity, or the exact quantity, which will precipitate all the mineral in the solution. If all the claims of his patent are good, it follows that others can only avoid infringement by using zinc dust in an unskillful way, by either using too much or too little. The right to use the dust being free to all, we think it follows, necessarily, that all have the right to adjust the quantity of the material to the necessities of each case, and to ascertain by experiment or analysis, if need be, the quantity that may be required to produce the desired end, and that such a use cannot be made the subject of monopoly; there being involved in it no discovery, but only the exercise of ordinary prudence and skill."

The finding of the court below that Bellis did not discover the eutectic, nor the eutectic proportions of any combination of two or more salts, is plainly right. For as the judge goes on to say:

No new principle or scientific fact was discovered. The technical literature, published in this country and in Europe long before Bellis began his work, abounds in charts, tables, and diagrams giving the results of experiments made by eminent scientists who had chartered the eutectic point of nearly all conceivable combinations of salts and alloys. Notably among these reference works were the tables of Landolt, Bornstein & Roth, published in Germany in 1912; the tables of Bruni and Menighini, published in Italy in 1910; of Otto Menge, published in Germany in 1911; of Ruff and Plato, published in Germany in 1903; and tables submitted by Lantsberry & Page at a meeting of the Society of Chemical Industry in London held March 29, 1917, and published on February 28, 1920, in the Journal of the society. If one desired to ascertain the eutectic proportions of any two salts, he had but to refer to the tables of these scientists. It cannot possibly be said that it required the exercise of inventive genius to isolate the eutectic."

If we apply this finding to the alleged invention, as stated by Bellis himself, it is enough to end the case. We quote from his cross-examination:

"X-Q. 19 (by Mr. Neal). Major Bellis, what is the nature of your alleged invention of your first patent? A. The first patent points out that a eutectic bath has advantages over any other baths for the heat treatment of metals."

"X-Q. 29. Do you think that you were the first one that had obtained the eutectic of two salts, isolated so to speak? A. I do.

"X-Q. 30. No one before you ever isolated the eutectic of two salts, in your opinion? A. In my opinion, no one ever did.

"X-Q. 31. And therefore you think that you invented this eutectic proportion? That you think is your invention? A. Yes, sir.

"X-Q. 32. And therefore you think that your first patent really covers a eutectic of any two salts which might be used for heat treating? A. Yes, sir.

"X-Q. 33. In other words, if another investigator, through arduous experiments, developed two salts such as are not named in your patent, and through his experiments found the eutectic of those two salts, and used them for heat-treating purposes, it would be within the terms and claims of your first patent? A. Yes, sir."

The overwhelming weight of evidence is against this contention.

But plaintiff's learned counsel argues that the court below was wrong in regarding the claims as process claims. He reiterates that "they are not process claims"; that "they are product claims, or, in the language of the patent act, composition of matter." We think the court thus took the most favorable possible attitude toward the plaintiff's contention that he made an invention; that his best argument is, not that Bellis discovered the eutectic as a scientific fact, or the eutectic of any usable combination of salts, but that he improved the use of salt baths by advising mixing them at or near the eutectic.

But this most favorable view of plaintiff's achievement falls far short of finding invention, as the learned judge points out in his discriminating review of the most pertinent parts of the bulky evidence as to anticipation, which we need not quote here. It is enough to note that, in publications and patents running from 1871 to about the time of Bellis' study, substantially all of the advantages claimed by Bellis for his salt bath are described—many of them accruing from combinations other than the eutectic. The result reached by the court below was required by this evidence, and is thus stated:

"The evidence in the case, therefore, compels the conclusion that in prior patents and in prior printed publications there had ap-

peared, before Bellis entered the art, the more or less general use of salt baths for heat-treating steel, and the advantages of the bath over any other known method had been pointed out, and the salts recommended by Bellis had been used. But it is the plaintiff's contention that the evidence respecting the prior art does not disclose that any one had discovered that the best results would be obtained by mixing these components in the eutectic proportion. It is true that, in some of the works dealing with the practical art, the word 'eutectic' does not seem to have been used, nor does it appear in any of the patents cited, but it is obvious that all of the writers and inventors had in mind that mixture which would approximate the lowest melting point of the fused materials. That the proportions recommended, whenever they were recommended, approximate those proportions which Bellis gives to the eutectic, appears from the following tables dealing with the two formulæ disclosed in the Bellis patent:

English, French, German, and Italian—bearing on the use of salt baths and eutectics. Collins wrote Bellis on January 19, 1921: "We believe that all our attempts to cover the eutectic feature, even [if] they are granted, will be an invalid patent, as it should be readily shown by references to the technical literature of the art that we have evolved no new feature." In this view Collins was plainly right. When the application was filed, claim 1 read: "A eutectic mixture of fused salts." The Patent Office rejected this claim, saying: "It is old to form a eutectic mixture of fused salts, as shown by the following: [Citing publications.]" After argument, the examiner adhered to this ruling and Bellis canceled the claim. But, as shown, inter alia, by the testimony of Bellis quoted above, the contention is now in effect for an equivalent monopoly.

[2] A careful study of the record leads us to the conclusion that Bellis and his associates and assistants made an exhaustive and highly intelligent study of the voluminous tech-

Bath No. 1.

| | Bellis. | Eaches. | Houghton, 1918. | Landlolt. |
|---|---|---|---|---|
| Na Cl (sodium chloride) | 39% | 25% | 33⅓% | 34.7% |
| Na₂ Co₃ (sodium carbonate) | 61% | 75% | 66⅔% | 65.3% |

Bath No. 2.

| | Bellis. | Houghton, 1914. | Lantsberry. | Menge. |
|---|---|---|---|---|
| Ca Cl (calcium chloride) | 71% | 75% | 72.5% | 68% |
| Na Cl (sodium chloride) | 29% | 25% | 27.5% | 32% |

The eutectic and the method of finding the eutectic, as revealed in the patent, were old. The use, for heat-treating purposes, of salt baths composed of two or more salts, was known both to the patented and the practical art. None of the advantages of the Bellis bath, so far as he discloses them in his patent, was new. The constituent salts recommended by him and the constituents of his commercial product, which incidentally are not the same, had previously been used with a substantial degree of success, and in proportions approximating those suggested in the Bellis patent."

The genesis of the patent bears out the conclusion of the court below that the patent is nothing but "old thoughts and old ideas taken from the practical art" and "skillfully couched in new and more technical phraseology." Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566.

When Bellis was at work at the Springfield Armory, he associated himself with Collins, who had had experience in patents and who made an investigation of the literature—

nical literature, and merely applied the knowledge thus acquired, of course, testing their results by experiments along the lines taught. But neither Bellis nor his associates added anything substantial to the art. To avail of others' teaching is not to invent; it is useful, but not new. Smith v. Nichols, supra.

Walen participated in this series of studies and experiments. Whether his conclusion, embodied in his commercial product, is substantially like the plaintiff's, the record does not clearly show. But, whether like or unlike, he and his concern are within their rights in making and selling the best and cheapest salt bath they can work out.

[3] The second patent, No. 1,520,744, is for an essentially nonhygroscopic eutectic mixture of potassium chloride and sodium carbonate, and must fall with the first patent. Plaintiff's own expert describes this patent as "an embodiment of the principles disclosed in the first patent."

The decree of the District Court is affirmed, with costs to the appellees.