DE CEW v. UNION BAG & PAPER CORPORATION.

Civil Action No. 488.

District Court, D. New Jersey.

March 2, 1945.

Bartlett, Eyre, Keel & Weymouth, of New York City (Richard Eyre and Charles H. Keel, both of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess and Thomas M. Day, both of New York City, of counsel), for defendant.

SMITH, District Judge.

This is a suit under the patent laws for the infringement of two patents; the one, No. 1,753,775, hereinafter referred to as '775, issued on an application filed by the plaintiff on May 24, 1929; the other, No. 2,041,285, hereinafter referred to as '285, issued on an application filed by the plaintiff on September 28, 1933. These patents, like those heretofore considered and discussed in the related suit, 57 F.Supp. 388, pertain to the manufacture of paper and cover improvements in the process of sizing the cellulose fibers of which papers are made, and, although cognate, must be separately considered and discussed.

The patents in suit cover further improvements on the art of sizing paper in the pulp, and particularly on the inventions defined in earlier patents to the plaintiff, Nos. 1,558,845 and 1,589,947. The patents and publications of the prior art discussed and considered in the related suit, including the patents there in suit, are relevant and material to the issue of validity here presented, but a repetitious discussion of them would seem to be superfluous. It is, therefore, suggested that a reading of the earlier opinion, hereinabove cited, will facilitate not only a comprehen-

sion of the art but also a proper appraisal of the present patents.

## Patent No. '775

The invention of this patent is defined in claim 3 thereof, which is typical, as follows: "A method of sizing paper which consists in treating the paper making fibre with sulphate of alumina, *allowing the fibres to absorb the alum*" (sulphate of alumina) *"until the pH of the solution is over 5,* and then treating the surface of the astringent fibres with a solution of rosin size." (Emphasis by the Court.) The other claims, which are quoted in the footnote,[1] define nothing more than specific variants of the same invention. The dissimilarity of the respective claims is not substantial, and is, therefore, not material to either the issue of validity or infringement.

It is here urged by the patentee, as it was in the prosecution of his application for the patent, that the invention, as thus defined, is a specific improvement on the invention covered by an earlier patent to him, No. 1,-585,469. The invention of the latter patent is defined in claim 2 thereof as follows: "A method of sizing paper pulp, which consists in treating the fibers (while in the beater) with sulphate of alumina and adding a stream of size emulsion to the fibers (as they are entering the Jordan engine.")

(Parentheses by the Court.) It is obvious, upon a mere comparison of the quoted claims, that the inventions of the patents are identical in substance, except for the allegedly novel concept of maintaining the hydrogen ion concentration in the stock, the degree of acidity, within the defined limits. It is of persuasive significance that upon rejection of the claims in suit on the earlier patent, this concept was urged by the patentee as the only critical distinction.

When the claims in suit are construed in the light of the prior art, as they must be, it is evident that the essence of the invention lies only in this allegedly novel concept of maintaining the hydrogen ion concentration in the stock, the degree of acidity, during the sizing operation, within the prescribed optimum, to wit, between 5.0 pH and 6.8 pH, the lower coefficient denoting the degree of highest acidity, and the higher coefficient denoting the degree of lowest acidity[2] at which an effective size may be coagulated. The process of the said claims is otherwise old, the successive steps thereof, to wit, the introduction of the aluminum sulphate into the stock, thus effecting the acidification of the fibers and the surrounding solution, followed by the introduction of the rosin size emulsion, thus effecting the coagulation of the size, having been disclosed earlier not only by the patentee[3] but also by others.[4] This, it

---

[1] "1. A method of sizing paper which consists first in making the fibres astringent with a solution of sulphate of alumina and having the solution surrounding the fibres at a pH. of from 5. to 6.8, and later adding a sizing material.

"2. A method of sizing paper which consists in first making the fibres astringent with a solution of sulphate and having a pH. of from 6 to 6.8 and then adding a solution of free rosin size.

"10. A method of sizing paper making fibres which consists in treating the fibres with a solution of sulphate of alumina in such a manner that when a size is added to the paper stock chest, the size will react with the fibres more rapidly than it will with the solution."

[2] The pH value is denotative of the relative acidity or alkalinity of a solution. The concentration of the hydrogen ion in an acid solution is determinative of the relative degree of acidity (intensity factor) as distinguished from total acidity (quantity factor); the concentration of the hydroxyl ion in an alkaline solution is determinative of the

degree of alkalinity (intensity factor) as distinguished from total alkalinity (quantity factor). The degree of acidity is proportional to the numerical excess of hydrogen ion; and the degree of alkalinity is proportional to the numerical excess of the hydroxyl ion. The result is expressed in terms of pH values; the scale is a logarithmic scale in which 7.0 denotes neutrality. The scale may be illustrated as follows:

Acid
etc. 5.6, 5.8, 6.0, 6.2, 6.4, 6.6, 6.8,
Neutral
7.0,
Alkaline
7.2, 7.4, 7.6, 7.8, 8.0, 8.2, 8.4, etc.
The values below 7.0 denote acidity, the degree of acidity increasing as the numerical coefficient decreases; the values above 7.0 denote alkalinity, the degree of alkalinity increasing as the numerical coefficient increases.

[3] Patents to DeCew, No. 1,589,947 (specifications), and No. 1,585,469 (specifications and claims).

[4] Hofmann, Manufacture of Paper, 1873; Griffin and Little, Chemistry of

appears from the cited references, was common practice in many paper mills long prior to its disclosure by the patentee.[5]

It follows that the ultimate issue presented for determination is whether or not the embodiment of this allegedly novel concept —conceived by others whose disclosures preceded that of the patentee, as will presently appear—in a process otherwise old, is such an advance over the prior art as will support the claim to patentable invention. It is our firm conviction, based upon the reasons hereinafter expressed, that it is not.

## State of the Art

The art of sizing paper in the pulp, as practiced in the modern paper mill, was discovered and disclosed by Moritz Illig[6] in 1807. This art, although not immediately accepted generally, has been in common use without substantial modification since 1880, when the manufacture of paper from wood pulp was found to be commercially feasible.[7] The development of this art, consistent with the progress of the paper industry, has been marked by numerous improvements on the method of application[8] but by few modifications of the chemical process. It is significant that the improvements on the chemical process, including that of the patent in suit, have been minor, despite extensive study and numerous explanations of the sizing phenomenon.

The methods of application, as distinguished from the chemical process, and the pertinent improvements thereon, were adequately considered and explained in the opinion filed in the related suit. The present discussion is limited, so far as it is reasonably possible, to the chemical process, the applied chemistry of the art, to which the patent in suit is particularly and primarily directed.

The chemical process is one in the practice of which the hydrated cellulose fibers, suspended in a water medium, are so treated as to overcome their absorptive quality and impart to the finished paper its water repellent property. The chemical ingredients, aluminum sulphate (the coagulant) and rosin emulsion (the size), are successively introduced into the stock[9] in the course of its preparation and as it flows to the paper machine.[10] The resulting chemical reaction, properly controlled, produces a colloidal gel[11] of aluminum resinate and rosin,[12] which is adsorbed[13] by the cellulose fibers. The water of suspension is removed in the final operation, felting and drying, and the rosin size is thus rendered permanent, imparting to the finished paper its water repellant property.

The chemical reaction is progressive and complex but for our present purpose may be sufficiently explained as follows: The solution of aluminum sulphate, an acid solution having a pH value of approxi-

---

Paper Making, 1894; Roschier, The Importance of Hydrogen Ion Concentration in the Sizing of Paper, 1928.

[5] See opinion filed in related suit.

[6] Illig, Instructions for Sizing Paper In the Pulp, 1807, from a reprint in Papier-Zeitung, 1887.

[7] The early history of the art is somewhat obscure, but the approximate dates herein quoted may be accepted as accurate for our present purpose.

[8] See opinion filed in related suit.

[9] The term "stock," as here used, is descriptive of the wood pulp, suitably prepared and brought to a predetermined fluidity and consistency by the introduction of water.

[10] The chemical treatment of the fibers is performed as a concomitant operation in the preparation of the stock. The procedure is briefly summarized in the opinion filed in the related case.

[11] The term "colloidal gel," as here used, is descriptive of the colloidal dis-

persion of the insoluble particles of aluminum resinate and rosin, as distinguished from a molecular dispersion characteristic of a true solution.

[12] There is a difference of opinion among the technicians as to the exact composition of the colloid but it is generally assumed that it is composed of aluminum resinate and free rosin.

[13] There is a difference of opinion among the technicians as to the nature of the phenomenon, but it seems to be the accepted theory that the colloid of aluminum resinate and rosin clings to the hydrated cellulose fiber, forming a protective film which, upon removal of the water of suspension, renders the finished paper impervious to water. It is generally conceded that the affinity, that of the hydrated cellulose fiber for the colloid is not a "chemical affinity" but a "physical affinity" characteristic of some colloidal substances. The phenomenon is known as adsorption.

mately 3.5 to 4.0, coagulates the rosin emulsion,[14] an alkaline "solution"[15] having a pH value of approximately 8.0 to 9.0, thus producing the colloidal gel of aluminum resinate and rosin, which, as heretofore explained, is adsorbed by the hydrated cellulose fibers.[16] This adsorption, the ultimate sizing reaction, heretofore described in footnote 13, is ascribed to the colloidal properties of the components, the hydrated cellulose fibers and the gel. The described chemical reaction is influenced by several factors, such as beating, temperature, etc., but it is necessary to consider here only the one to which the claims in suit are particularly directed, the hydrogen ion concentration in the stock, the degree of acidity. The rosin emulsion is efficiently coagulated, producing the colloidal gel essential to the ultimate sizing reaction, only if the optimum of acidity, to wit, within the range of 4.0 pH and 6.8 pH,[17] is maintained in the stock throughout the reaction.

It should be noted, however, that the ultimate sizing reaction, the adsorption of the colloidal gel by the cellulose fibers, is not influenced, except in efficiency, by the sequence in which the chemical ingredients are introduced into the stock.[18] The same reaction occurs either upon the introduction of the aluminum sulphate into the stock, previously treated with rosin size emulsion, or upon the introduction of the rosin size emulsion into the stock, previously treated with aluminum sulphate. The latter practice, embraced in each of the claims in suit, was followed in the industry for many years prior to the present invention,[19] and was disclosed by the patentee in an earlier patent, No. '469. It is apparent from the cited references that local mill conditions are frequently determinative of the practice.

## Prior Art

Thus far we have considered and explained the chemical process in the light of after-acquired knowledge—that is, knowledge acquired since 1807, the year of Illig's discovery, but prior to 1929, the year of DeCew's alleged discovery—in an endeavor to facilitate a proper understanding of the purported invention and a due appreciation of the prior art references hereinafter summarized and discussed. We now turn to a consideration and discussion of the earlier disclosures, from which it clearly appears that the patentee's contribution to the art, if any, does not transcend the common knowledge and skill of the art, the test of patentable invention.

It was common knowledge long prior to the present invention that the *coagulation of the size,* as distinguished from a mere *precipitation of rosin* on the cellulose fibers, was essential to the ultimate sizing reaction, the adsorption of the colloidal gel of aluminum resinate and rosin by the hydrated cellulose fibers. It was likewise common knowledge that an excessive degree of acidity in the stock impaired or destroyed the colloidal gel, producing instead a flocculent precipitate, thus affecting the efficiency of the ultimate sizing reaction.[20] The known methods of controlling acidity in the stock, as well as the known methods of measuring the degree of its intensity, were, however, crude and inadequate. These conclusions, adequately supported by numerous references, are not disputed.

It would be error to assume that the paper industry had failed, until the advent of the present invention, to recognize the importance of acidity control. It was common practice to maintain the acidity of

---

[14] The term "rosin emulsion," as here used, is descriptive of a diluted rosin soap in which the microscopic particles of rosin, previously saponified, are held in suspension in a reactive "solution." The rosin is insoluble in water.

[15] The term "solution," as here used, is a misnomer, but seems to be commonly accepted in the industry as descriptive of diluted rosin soap.

[16] This is a complex reaction in which the hydrated cellulose fiber is a component. The colloidal property of the hydrated cellulose fiber is conducive to the adsorption. The reaction is not one

in which the aluminum resinate and rosin are *precipitated* on the fibers.

[17] We have arbitrarily selected the widest range disclosed by the cited references.

[18] Roschier, The Importance of Hydrogen Ion Concentration in the Sizing of Paper, published in 1928; Britton, Hydrogen Ions, Their Determination and Importance in Pure and Industrial Chemistry, published in 1929.

[19] See notes 4 and 5.

[20] Excessive acidity also impaired certain qualities of the fibers, but we deem it unnecessary to discuss this effect.

the stock within efficient limits, although the lack of an adequate scientific method of determining the limits made it difficult to define the optimum with certainty. Under the earliest control method the sizing result, observed as the stock flowed to the paper machine, was determinative of the optimum;[21] the maintenance of an efficient optimum was contingent upon the skill of the operator. It would seem that the paper industry, even in its earliest stages, lacked only a scientific method of determining the degree of acidity in the stock and defining its limits with accuracy.

It may be reasonably inferred that even under the earliest practice the hydrogen ion concentration in the stock, the degree of acidity, was maintained within the range of 4.5 pH and 6.5 pH. There is now conclusive proof that the size could not have been coagulated and an efficient sizing reaction thus produced unless the hydrogen ion concentration was maintained within this range; if the acidity of the stock fell below 6.5 pH (tending toward alkalinity), the rosin size would not have been coagulated but would have remained in suspension in the emulsion,[22] and, if the acidity of the stock rose above 4.5 pH (tending toward excessive acidity), the colloidal gel, admittedly essential to the ultimate sizing reaction, would have been impaired or destroyed, producing a flocculent precipitate.[23] The discovery of a method of maintaining the hydrogen ion concentration within predetermined limits, and its subsequent adoption by the industry, undoubtedly contributed to the efficient application of the sizing process, but the process remained unchanged.

It appears from the cited references that prior to the present invention extensive studies of the sizing process were made by those who preceded the patentee. These studies were directed to the problem of controlling the hydrogen ion concentration in the stock during the sizing reaction and led to the discovery of control methods which were readily adaptable to the sizing process. The results of these studies were widely published, and a fund of pertinent

knowledge was available to the patentee when he entered the field in 1929. The apposite publications are worthy of special consideration.

Beltzer, The Sizing of Paper, published in 1924.

This article emphasizes the importance of maintaining the hydrogen ion concentration of the stock within predetermined limits and recommends a simple method of control which has been superseded by the scientific methods hereinafter considered. It is therein recommended:

Page 843. *"The hydrogen ion concentration of the stock* as it reaches the wire *(should) be so low* that, even if no size were added, *it could not affect the indicator* usually employed, namely, litmus test paper."

Page 843. "In practice, sizing is largely controlled by means of litmus test paper. It has been observed that in order to have a properly-sized sheet, the water should be *very slightly acid to litmus* when it reaches the machine wire. If the litmus does not redden even slightly after a minute, that is, if the water is neutral, the paper is practically unsized; and if the water has an alkaline reaction the paper is as porous as blotting paper. On the other hand, *if the test paper reddens too quickly, the stock is too acid* and the sizing will be defective; but the results will not be as bad as in the case of a neutral or of an alkaline reaction." (Emphasis by the Court.)

This disclosure, if it is to be accorded its full significance, must be appraised in the light of that which was common knowledge to the skilled technician, to wit, that in the interpretation of the color change, blue to red, the degree of acidity is reflected in the intensity of the color and the rapidity of the reaction. If the hydrogen ion concentration of the stock, as it reaches the wire, is so low that it will not affect the indicator, the acidity of the stock must be below 6.5 pH and nearer 7.0 pH, the point of neutrality; if the hydrogen ion concentration of the stock is so high that the indica-

---

[21] An efficient sizing reaction imparted to the cellulose fibers certain physical properties readily recognized by the skilled technician. An effective size possesses certain characteristics which are apparent on mere inspection.

[22] The coagulation of the rosin size cannot occur except in an acid medium.

[23] Excessive acidity results in a precipitation and not a coagulation of the rosin size. There may be some sizing effect, but the flocculent precipitate is "washed out" in the paper-making process.

tor "reddens too quickly," the acidity of the stock must be above 4.5 pH and nearer 4.0 pH. The predetermined limits of acidity, although not defined by Beltzer in terms of pH values, coincide with the transition range of the indicator, that is, within the approximate limits of 4.5 pH and 6.5 pH.[24]

The relevancy of this reference may be challenged on its failure to define the optimum of acidity with accuracy. However, it is our opinion that this failure does not detract from the significance of the disclosure, especially where, as here, its teachings are clear to the person skilled in the art.

Thiriet and Delcroix, Electric Theory of Rosin Sizing, published in 1924.

These writers, without asserting any claim to original discovery, concede that the efficiency of the ultimate sizing reaction is influenced by the hydrogen ion concentration in the stock, the degree of acidity,[25] and emphasize the importance of maintaining the hydrogen ion concentration in the stock within predetermined limits, approximately 4.5 pH to 5.5 pH.[26] The relevancy of the articles, aside from the theory of sizing therein advanced in support of its teaching, lies in the following disclosures:

Page 54, et seq. "But in connection with these particularly convincing results we wish to say a word as to the method of applying our theory to the control of sizing in paper mills. The actual control method must be very carefully chosen, as otherwise disappointment is almost bound to follow. The results which we have given above were obtained only at the expense of a very close and careful control of operations.

"Various methods can be used: preliminary neutralization of the raw water with acid, substitution of sulphuric acid for part of the aluminum sulphate, direct addition of sulphuric acid in the beaters, etc. Each case should be carefully studied and treated according to the particular conditions prevailing. But whatever procedure be adopted, *the principle of the method remains the same*—namely, *to adjust the hydrogen ion concentration of the pulp suspension* as near as possible *to the optimum value for sizing.*

"We make use of two colored indicators, methyl red and sodium alizarin-sulphonate, which have opposite color changes, the one from yellow to red and the other from red to yellow.[27] When the back water from the paper machine gives practically the same color with both indicators, the pulp suspension has the proper pH. If the methyl red is redder than the sulphoalizarin, the stock is too acid, while if the methyl red is yellow the pulp is too alkaline. The test is so simple that it can easily be carried out by the machine tender. Its two chief advantages, besides its simplicity are:

"(1) *The pH range over which sizing is possible is much wider than that over which the two indicators give approximately the same color. Consequently, any appreciable variation in the pH is detected long before the danger point is reached, and conditions can be corrected in time to avoid defective sizing;*" (Emphasis by the Court.)

These writers recommend, as does Beltzer, that the hydrogen ion concentration in the stock, the degree of acidity, be maintained within predetermined limits. These limits, although not defined in terms of pH values, are fixed with certainty by the transition range of the respective indicators. The average mill operator, possessing nothing more than the expected knowledge and skill, can follow the teachings of the disclosure without difficulty. The degree of acidity in the stock at the "paper

---

24 The pH values herein adopted are only approximate. It is not to be assumed that litmus may be used to measure the hydrogen ion concentration in terms of pH value; it reflects only the relative degree of acidity, and, as stated, this is reflected only in the intensity of the color and the rapidity of the reaction. The color change is susceptible of translation only in terms of approximate values.

25 Page 53: "It is generally admitted, though no explanation has been put forth, that the degree of acidity of the

medium affects sizing. We have already explained how this comes about, and we consider it as the most important single factor in sizing."

26 It should be noted that this range is not defined in the article as the optimum but a reasonable interpretation of the disclosures supports our conclusion.

27 The transition range (acid-alkaline) of sodium alizarin sulphonate is between 3.7 pH and 5.2 pH; the transition range (acid-alkaline) of methyl red is within 4.2 pH and 6.3 pH.

machine," at which point the sizing reaction has progressed to completion, is indicative of the hydrogen ion concentration in the stock *at the time of the sizing reaction;*[28] it is obvious that the pH reading at this point has no other significance.

It is evident, if the teaching of this reference is properly interpreted and accorded its full significance, that the hydrogen ion concentration conducive to an efficient sizing reaction is within the approximate range of 4.5 pH and 5.5 pH. This conclusion is supported by a later disclosure.

Thirict and Delcroix, The Technique of the Use of Rosin Size in Paper Making, published in 1926.

Page 393. "The authors propose the following theory for explaining the mechanism of sizing: *Over a certain range of hydrogen ion concentration, pH, the cellulose and rosin have electric charges of opposite signs, so that the positive rosin and negative cellulose are mutually attracted, and sizing is possible;* outside of this range, the electrolyte is too acid or too basic, the cellulose and rosin have charges of the same sign and repel each other, so that sizing is impossible." (Emphasis by the Court.)

Page 394. "We have shown on a previous occasion that the rosin particles are held by the cellulose fibers because of electric charges of opposite signs on the surfaces of the two substances *when the hydrogen ion concentration of the stock, as expressed by the pH, lies between certain limiting values.* This attraction prevents the rosin being carried away by the water that drains through the paper machine wire; and at the driers, the size is permanently fixed to the fibers by fusion."

Page 394. "However, if we admit that the elementary constituents of matter are the negative electron and the hydrogen ion, it is easy to understand that the pH of a liquid exerts considerable influence on the equilibrium of the constituents of the solid immersed in it, that is, on the surface contact charge. We have determined experimentally, and verified in the mill, *that very good results were obtained when the pH of the stock was kept in the neighborhood of 5.0 to 4.5."* (Emphasis by the Court.)

The particular relevancy of the reference lies in the specific teaching that the size may be coagulated and an efficient sizing reaction thus produced only if the hydrogen ion concentration in the stock, the degree of acidity, is maintained within a predetermined range, preferably "in the neighborhood of 5.0 and 4.5" pH. The theory upon which this teaching is predicated need not concern us.

It should be noted that the writers, although recommending that the degree of acidity in the stock be maintained within the range of 4.5 pH and 5.0 pH, do not assert that this optimum is critical. It is conceded that the size may be coagulated and an efficient sizing reaction thus produced within a wider range; the only warning is against any "appreciable variation" which would affect the efficiency of the ultimate sizing reaction. This teaching is in agreement with later disclosures.

Shaw, Hydrogen Ion Concentration in the Paper Mill, published in 1925.

Shaw, an associate technologist in the Bureau of Standards, demonstrated and proved by a series of experiments that the efficiency of the ultimate sizing reaction was influenced by the hydrogen ion concentration in the stock, the degree of acidity, and that this efficiency increased with the hydrogen ion concentration until the maximum of the optimum, approximately 4.6 pH, was attained. The results of these experiments are extensively reviewed in the cited reference. It is therein disclosed that an effective size is coagulated if the degree of acidity in the stock is maintained within the range of 4.6 pH and 5.4 pH.

It is urged by the patentee that in the Shaw experiments the hydrogen ion concentration in the stock *at the time of the sizing reaction* was below 4.0 pH. This, however, is clearly not the fact. The highest degree of acidity produced in

---

[28] The pH readings, carefully made and interpreted, enable the skilled technician to determine the degree of acidity in the stock at the time of the sizing reaction. The hydrogen ion concentration decreases as the chemical reaction between the rosin size emulsion and the aluminum sulphate progresses. A reading at the paper machine of 6.0 pH is indicative of a hydrogen ion concentration of approximately 5.0 pH to 5.5 pH at the time of the sizing reaction; a reading at the paper machine of 4.8 pH is indicative of a hydrogen ion concentration of approximately 3.8 pH to 4.3 pH at the time of the sizing reaction. Under the teachings of the reference, the former represents the optimum of acidity and the latter represents the danger zone.

"machine runs" 2 and 3 was 4.6 pH, and this was produced upon the introduction of the aluminum sulphate into the stock at the beater; the lowest acidity produced was 5.4 pH, and this was produced at the machine chest as the reaction neared completion.[29] It is evident that the optimum is within these limits.

The writer expresses the opinion "that considerable economy in the use of alum and better control of the paper-making processes would be effected if an optimum degree of acidity were determined and observed in the mill." It is not mere coincidence that the patentee likewise claims for his invention "economy in the use of alum."

Taylor, The Application of Hydrogen Ion Control to the Manufacture of Pulp and Paper, published in 1926.

This is a comprehensive treatise [30] in which the writer, after emphasizing the importance of hydrogen ion control in the manufacture of paper, recommends a control method which is practiced in many paper mills. Its relevant disclosures follow:

Page 38, et seq. "The *point in the paper making process at which control of acidity is of the greatest importance is, however, in the precipitation of the sizing.* The water which is used in paper manufacture is in most cases alkaline. The reaction of the pulp will of course affect this reaction but, if the pulp is neutral, the natural alkalinity of the water is increased by the addition of the sizing agent which is usually rosin, this being added in the form of an alkaline rosin soap. This additional alkalinity will of course depend on the percentage of free rosin in the sizing.

"It has long been known that the stock should be 'slightly acid' during a part of the beating and at the time of delivery to the paper machine. This acidity is usually obtained by the addition of alum, which also precipitates the sizing. 'Slightly acid' is a very indefinite term which varies enormously, depending on the method of testing and on the meaning of the term to various operators. If the stock is too nearly alkaline, the sizing will not be completely and efficiently precipitated. On the other hand, additional alum over that necessary for precipitation of the sizing, adds to the cost of manufacture and has a harmful effect." [31] (Emphasis by the Court.)

This writer recommends colorimetric control of the hydrogen ion concentration. It seems unnecessary to review this method except to note that in its application the transition ranges of certain color indicators are determinative of the limits of acidity. The indicators are compared with standardized colors of known pH value, and the hydrogen ion concentration, or pH value, is reflected in the "comparative reading."

Taylor, Control of Acidity and Alkalinity in the Manufacture of Paper, published in 1927.

This article contains a brief summary of the writer's earlier discussions. The pertinency of the article, however, resides in the following disclosure:

Page 1145. "It is impossible to give any optimum pH value for the sizing operation, as this value is affected by many different factors. *It is known that some mills obtain best results at pH values ranging from 4.2 to 5.4 but (it) is necessary for each mill to determine its own optimum.* After this is done, it is a simple matter to maintain this optimum continuously." [32] (Emphasis by the Court.)

Roschier, The Importance of Hydrogen-Ion Concentration in the Sizing of Paper, published in 1928.

This is such a comprehensive treatise on the subject that we find it difficult to quote from it without detracting from the full import of the teachings of the writer. The apposite disclosures follow:

Page 640. "In time this theory was both amplified and criticized, and the Frenchman Orioli published a most interesting criticism as a result of experiments carried out in 1848. The most important parts of his

---

[29] It would be impossible to adequately summarize these experiments without extending this opinion beyond reasonable bounds.

[30] Presented at a meeting of the Technical Association of the Pulp and Paper Industry and published in the Technical Association Papers, Series IX.

[31] See also: Taylor, The Meaning of Hydrogen Ion Concentration and Its Ap-

plication to the Paper Industry, presented at a meeting of the Technical Association of the Pulp and Paper Industry, and published in the Paper Trade Journal in 1925.

[32] See Technical Association Papers, Series IX, February 1926; Technical Association Papers, Series IX, No. 2, September 1926.

work is given in Hoffmann's treatise. Orioli showed that fibers have such a strong affinity for aluminum salts that the latter cannot be removed by washing. *He treated fibers with a solution of alum, removed the excess of solution, and with the fibers prepared in this manner, he obtained a rosin sized sheet of very good quality* using but a third of the amount of alum that was then considered necessary to obtain the same degree of sizing." (Emphasis by the Court.)

Page 640. "The interesting work of Orioli, which was carried out in the early days of the practical application of rosin sizing, has been used as a starting point by numerous later investigators who tried to develop a satisfactory theory of sizing. Some of his claims were subsequently confirmed."

Page 680. "Quite recently, Oman stated that *the presence of alum was of secondary importance, provided the fibers had previously been treated with alum to give them a positive charge.* He arrived at this conclusion as a result of experiments, in the course of which, *he treated cellulose with alum, washed the fibers to remove the alum that had not been adsorbed, and then obtained a perfectly sized sheet by the action of colloidal free rosin, without addition of alum, on the fibers that had been thus treated.* Oman repeated his experiments with both bleached and unbleached pulp, and he always obtained a properly sized paper." (Emphasis by the Court.)

Page 715. "The amount of alum used varies considerably in different mills, depending on local conditions, such as the hardness of the raw water, composition of the size, acidity of the pulp, fillers, etc. Many investigators, among whom may be mentioned Lorenz, *claim that nearly all the aluminum that takes part in the sizing is adsorbed by the fibers;* others on the contrary, including Aschan, consider. that, roughly, two-thirds of the alum remains in the back water." (Emphasis by the Court.)

It is apparent that this is a complete disclosure of the successive steps of the purported invention, to wit, "treating the paper making fibers with sulphate of alumina, allowing the fibers to absorb the alum * * and then treating the surface of the astringent fibers with a solution of rosin size." (Claim 3 of '775.) It is equally apparent that the principle [33] advanced by the patentee in support of his claim to invention is identical with the principle discovered by Orioli and later proved by Oman's experiments.

The Roschier article continues:

Page 717. "Those who are accustomed closely to follow the sizing operation in the mill, know that the stock frequently has a pH *value of 5.5 when it reaches the paper machine,* and yet the paper is properly sized. In kraft paper mills, sizing is often carried out *at a very low acidity* (pH *value of 5.8),* and very good sizing is obtained with a small amount of rosin." (Emphasis by the Court.)

Page 746. "When fibers are sized with rosin and alum at an acidity corresponding to a pH value of 5.5 a well sized sheet is obtained. At this acidity, nearly all the combined rosin of the size milk is converted into aluminum resinate, which is difficultly soluble, and which is practically not ionized."

Roschier demonstrated and proved by a series of experiments, as had Shaw, that the efficiency of the ultimate sizing reaction is influenced by the hydrogen ion concentration in the stock, the degree of acidity, and that this efficiency increased with the hydrogen ion concentration until the maximum of the optimum, approximately 4.5 pH, is attained. Roschier declared his preference for a hydrogen ion concentration of approximately 5.2 pH, but expressed the opinion that the optimum of acidity conducive to an efficient sizing reaction is within the range of 4.5 pH and 5,5 pH.

The conclusions of this writer are briefly summarized by him as follows:

Page 747. "We have already explained how aluminum resinate is partly decompos-

---

[33] "The new principle involved in this process is that *the small amount of alum used is nearly all absorbed by the fibres so that when the size solution is added a substantial part of the size is precipitated on the surface of the acidified fibre* and the balance is slowly reacted upon by the slight amount of alum remaining in solution. When the acidity is greater than above stated, then the size is coagulated by the alum solution and does not react with the astringent fibres.

"I may go further and *wash out any free acidity in the water surrounding the pulp fibres or neutralize it, and then size the pulp by adding a diluted size to the acidified fibres* so that all of the size will be coagulated by the fibre." (Specifications of '775, pg. 1, *ll.* 9 to 100, and pg. 2, *ll.* 3 to 8). (Emphasis by the Court.)

ed into free rosin in very acid medium. It is generally considered that this fact is favorable to sizing. * * *. In the experiments described earlier in this paper, we showed that at a pH value of 4.5, nearly all the sodium resinate is converted into aluminum resinate. Fig. 4 now shows us that under such conditions, free rosin is not as good a sizing agent, but that on the contrary, *sizing is better at a pH value of 5.2* when the rosin is entirely in the form of aluminum resinate. The better sizing obtained in this case is not due to the larger amount of aluminum resinate present, but rather to the fact that a high H' ion concentration reduces the degree of dispersion of the particles taking part in the sizing, and also partly neutralizes their negative charge. * * *. When, * * *, *the acidity is lower, aluminum compounds are formed and adsorbed by the rosin, and the latter in turn by the fibers.* These compounds hold the rosin mechanically in contact with the fibers. It will be recalled that Orioli claimed that these compounds themselves possessed considerable sizing power.

"In weakly acid solution, rosin remains in suspension for a long time after it has flocculated, which means that the rosin forms a positively charged adsorption compound with aluminum hydrate; *while at a pH value of, say 3.7, it flocculates and rapidly rises to the surface.* This fact is of decided importance in sizing. *The better the suspension of the rosin the more easily does it come into contact with the fibers producing a better sizing. On the other hand, the higher the acidity and the further the reaction of the medium from the iso-electric point of cellulose, which is at a pH of about 6.0, the poorer the sizing.* Moreover, we have shown on other occasions that cellulose is more rapidly beaten at a low acidity, and it has been known for a long time that well beaten pulp is easier to size than one that is less beaten." (Emphasis by the Court.)

The pertinent teachings of Roschier may be briefly summarized as follows: First, a low degree of acidity in the stock, within the limits of 4.5 pH and 5.5 pH, effects a *coagulation* of the rosin size, thus contributing to the efficiency of the ultimate sizing reaction; second, a high degree of acidity in the stock, 4.0 pH or below, effects a *precipitation* of the rosin size, thus impeding the ultimate sizing reaction; and, third, the optimum of acidity conducive to an efficient sizing reaction is within the range of 4.5 pH and 5.5 pH. These teachings would seem to embrace the allegedly novel concept of the patentee.

Britton, Hydrogen Ions, Their Determination and Importance in Pure and Industrial Chemistry, published in 1929.

This monograph is pertinent because of the writer's evaluation of Roschier's disclosures. The criticisms are so clear and unambiguous that we quote them without comment:

Page 410, et seq. "The rosin size contains an excess of free rosin to an extent of from 15 to 25 per cent. * * *. Sizes prepared with the aid of 'atomisers' may, however, contain as much as 40 to 45 per cent. of free rosin. These sizes are added to the half-stuff in the 'beater' during the last half of the beating process and then by the interaction with *a solution of aluminum sulphate added either previously or subsequently,* liberates rosin and alumina upon the surfaces of the fibres, and so cements them together. *A well-known book on paper technology suggests that 'the order of adding the sizing agents appears in many cases to have but little influence on the final result,'* but goes on to say that '*in many mills it is customary to add a portion of the alum to the beater before running in the diluted size.*' The actual sizing operations should be carried out between pH 3.9 and 5.5 (cf. Roschier, Pappers och Travarutidskrift, 1927, 154), and for this reason it seems probable that the addition of a part at least of the aluminum sulphate before adding the size is beneficial, for in reacting with any alkali left in the pulp it will tend to precipitate aluminum hydroxide, and this is known to begin to take place at pH 4.0 to 4.1 (Britton, J. Chem. Soc., 1925, 127, 2120). Roschier states that sizing does not take place below pH 3.9, which is evidently partly due to the fact that aluminium hydroxide is then under normal conditions not precipitated. Moreover, the rosin in the size begins to flocculate at about pH 3.7 and to rise to the surface of the solution. The ideal condition is to get the rosin in the size into a very fine suspension, so that it can be readily and evenly deposited upon the fibres. *Too much acid increases the size of these particles and therefore gives rise to an irregular and defective sizing.* * * *. Actually, however, visible precipitation does ensue on account of the fact that the rosin passes first into a highly dispersed colloidal solution. Precipitation occurs at about pH 3.7. The

transition from the disperse phase to the precipitate which occurs with decreasing pH is accompanied evidently by an increase in the size of the colloidal particles, which coagulate as soon as they have acquired the magnitude requisite to stop the Brownian movement which tended to keep them in colloidal suspension. Hence as Roschier states, *the most satisfactory sizing conditions obtain at about pH 5,* when the particles have become of the dimensions suitable for efficient sizing. It will be observed that this pH lies about midway between the two extremes. Another advantage which is obtained by adding some aluminium sulphate before sizing, is that it sets up automatically a pH (about pH 4) and so prevents the precipitation of the curdy calcium resinates which are formed in alkaline solutions that would impair the sizing." (Emphasis by the Court.)

Page 412, et seq. "Much controversy has taken place as to the actual mechanism of rosin sizing, whether the sizing is due to aluminium resinate, or to rosin alone, or to rosin in conjunction with alumina. The fact is that both alumina and resin are deposited on the fibres, but the query arises when the condition is considered. The theory of sizing is of practical importance, for when the constitution of the material deposited on the fibre surface has once been established, it then will become an easy matter to find the optimum pH conditions for sizing. *It cannot be merely a coincidence that the pH for sizing should be above pH 4 and should preferably be about pH 5. * * *. In a sizing process taking place above pH 4, it is unlikely that any aluminium resinate would be contained in the precipitate on account of the hydrolysing action which would then take place. If combination occurred between such a weak acid and a weak base by virtue of the insolubility of the salt produced, then that salt would be precipitated from solutions more acid than pH 4, and would undergo decomposition as soon as the pH of the mother-liquor exceeded 4* (cf. Britton, J.C. S., 1925, 127, 2146). *Roschier's contention that basic aluminium resinate is produced at pH's below 4.5 appears therefore to be probable, but it is improbable that aluminium resinate, * * *, is formed at pH 5,* and for that reason should give rise to best sizing. That this should be the pH requi-

site for efficient sizing is probably due to the fact that aluminium hydroxide then attains enhanced insolubility and therefore becomes more firmly fixed to the fibres. * * *. Whatever the true explanation may be, sulphate is always found in the sized paper, so also is resin in the free state. *Roschier recommends the range pH 3.9 to 5.5 for sizing ordinary paper, and pH 5.8 for the sizing of kraft paper, which requires the minimum amount of resin.* From what has been said it seems feasible to consider sizing as being effected by the fixing to the pulp fibres of highly basic aluminium sulphate, free rosin, and perhaps a little basic aluminium resinate." (Emphasis by the Court.)

Joachim, Hydrogen-Ion Concentration, published in 1928.

This is a comprehensive treatise [34] on the subject of hydrogen ion control in the manufacture of paper. It is therein disclosed that the concept of maintaining hydrogen ion concentration in the stock, the degree of acidity, within predetermined limits, was common knowledge, and that the practice was in public use in many paper mills. We quote only the apposite disclosure:

"The importance of hydrogen-ion control in engine sizing is now generally realized by the paper industry. It has long been known that the *stock as it goes to the machine,* and the white water as it leaves the wire, *should be acid, in order to get perfect operation,* but no definite data regarding this acidity were available. The ratios of alum to size varied from mill to mill, some using as much alum as 5 times the weight of the size, while others obtained satisfactory results with equal amounts of size and alum. * * *. By aid of hydrogen-ion measurements, it has been definitely established that, in the majority of these cases, *almost unbelievable amounts of alum had been wasted,* and that by judicious adjustment of the *pH value of the stock and the white water,* and better washing of the stock before reaching the beaters, *considerable savings could be effected.* The optimum pH for sizing will, to a greater or less extent, always depend on local conditions. The optimum pH for precipitation of aluminum ions in pure solutions is about 5.0 to 5.5; however, this does not necessarily mean optimum sizing results,

---

34 Published in "The Manufacture of Pulp and Paper," Copyright 1928, by the Joint Executive Committee of the Vocational Education Committees of the Pulp and Paper Industry.

In some mills, *the stock is adjusted* to pH 4.5; *others are getting satisfactory waterproofing* with a pH of 5.8 to 6.0 in the beater; while some have as low as 3.5. No definite rules concerning this practice can be laid down, but *local conditions and the grades of paper being made will determine the degree of acidity to be maintained."* [35] (Emphasis by the Court.)

■ This last reference, although not in evidence, is from an encyclopedic work, available in many public libraries, and is, therefore, one of which the Court may take judicial notice. Werk v. Parker, 3 Cir., 231 F. 121, affirmed 249 U.S. 130, 39 S.Ct. 197, 63 L.Ed. 514. However, we reserve to the plaintiff the right, if he deems it necessary, to either challenge the reference or controvert its disclosure.

### Lack of Invention

It is evident that the disclosure of the patent in suit, examined in the light of the prior art and measured by commonly accepted standards, does not surpass the common knowledge of the art but arises from it as the consequence of its normal and expected development. The operative principle of maintaining the degree of acidity in the stock within limits conducive to an efficient sizing reaction was old, as were the successive steps of the purported invention.

It seems reasonably clear that the only obstacle to the efficient application of this principle, even in the earliest practice of the art, was the lack of a suitable method of determining these limits with accuracy. This obstacle was removed by the invention of adequate control methods which made possible the accurate evaluation of the hydrogen ion concentration in the stock, the degree of acidity—an invention to which the patentee can assert no claim.[36]

■ The invention of the patent in suit followed the disclosure of these control methods, as did other similar improvements in the process, but as a consequence of a normal development of the art and not as a result of a departure from the well-chartered course. There is, therefore, no patentable invention in the disclosure of the

patent in suit. Hansen v. Slick, 3 Cir., 230 F. 627, 632; Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 106 F.2d 644, 655, certiorari denied 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421; Electric Vacuum Cleaner Co. v. P. A. Geier Co., 6 Cir., 118 F.2d 221, 224, and other cases hereinafter cited.

It is apparent from our study of the history of the art and its development that the patentee was not the first to either recognize the problem or conceive the remedy. It was known long prior to the present patent that an excessive degree of acidity in the stock was destructive of the colloidal gel essential to the ultimate sizing reaction, and it was likewise known that this potential destruction could be overcome by the simple expedient of maintaining the degree of acidity in the stock within limits conducive to proper coagulation. The only obstacle to the progress of the art, as heretofore stated, was the lack of suitable methods of control. The earlier methods were crude and failed to meet the exacting requirements of the art, and the paper industry demanded more efficient methods, consistent with its progress.

■ This demand was met as early as 1924, if not earlier, by the invention and disclosure of adequate control methods peculiarly adaptable to the sizing process.[37] Their subsequent adaptation, a course plainly recommended, and the only contribution to the art to which the patentee can successfully lay claim, required nothing more than the expected ingenuity of the persons skilled in the art. It has been repeatedly held that such an adaptation, requiring nothing more than common knowledge and skill of the art, is not invention.

■ It is conceded by the patentee that the essence of his invention, as heretofore stated, resides in the allegedly novel concept of maintaining the degree of acidity in the stock, *during the sizing reaction, within the exact range* defined in the respective claims of the patent. The claim to patentable invention rests solely on this operative principle, which the patentee contends patentably distinguishes his disclosure from those of the prior art. We cannot agree with this contention. The concept is obviously not novel.

---

[35] Volume IV, § 4, at pages 66 and 67.

[36] These control methods were invented by others who preceded the patentee. Their disclosures are reviewed in the body of the opinion.

[37] These methods are disclosed in the cited references reviewed in the body of the opinion.

The cited references of the prior art disclosed not only the operative principle of maintaining the degree of acidity in the stock within predetermined limits conducive to an efficient sizing reaction but also an adequate method of determining these limits with accuracy. The prior art was, in fact, replete with such disclosures when the patentee entered the field. The ascertainment of the optimum of acidity—the alleged "discovery" upon which the patentee predicates his claim to patentable invention—required nothing more than routine experimentation, a course plainly indicated by the prior art and admittedly followed by the patentee.[38] This does not constitute "invention" within the meaning of the statute, especially where, as here, the experimentation followed the teachings of the prior art and required nothing more than the expected knowledge and skill of the art. Standard Brands v. National Grain Yeast Corporation, 3 Cir., 101 F.2d 814, affirmed 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17; Ruben Condenser Co. v. Aerovox Corporation, 2 Cir., 77 F.2d 266, certiorari denied 296 U.S. 623, 56 S.Ct. 145, 80 L.Ed. 443; Fink v. V. Foscato, Inc., 2 Cir., 79 F.2d 842; Ruben Condenser Co. v. Copeland Refrigeration Corporation, 2 Cir., 85 F.2d 537; Hamilton Laboratories v. Massengill, 6 Cir., 111 F.2d 584, certiorari denied 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444; Naamlooze Venootschafs, etc., v. Coe, 76 U.S.App.D.C. 313, 132 F.2d 573; Wallace v. F. W. Woolworth Co., 2 Cir., 133 F.2d 763, certiorari denied 320 U.S. 739, 64 S.Ct. 40; Libbey-Owens-Ford Glass Co. v. Celanese Corporation, 6 Cir., 135 F.2d 138, certiorari denied 320 U.S. 744, 64 S.Ct. 46.

The purported discovery of an *optimum of acidity*, within permissible limits previously recognized and admittedly not critical, does not enhance the claim to patentable invention. It has been held that such a discovery is not a patentable "discovery" within the meaning of the statute. DeLamar v. DeLamar Min. Co., 9 Cir., 117 F. 240; Brady Brass Co. v. Ajax Metal Co., 3 Cir., 160 F. 84, certiorari denied 210 U.S. 433, 28 S.Ct. 762, 52 L.Ed. 1136; Bethlehem Steel Co. v. Churchward International Steel Co., 3 Cir., 268 F. 361, certiorari denied 255 U.S. 572, 41 S.Ct. 376, 65 L.Ed. 792; Bellis Heat Treating Co. v. Heatbath Corporation, 1 Cir., 23 F.2d 239; Kwik Set

v. Welch Grapejuice Co., 2 Cir., 86 F.2d 945; American Lecithin Co. v. Warfield Co., 7 Cir., 128 F.2d 522. This is particularly true where, as here, the principles of investigation being known, the purported discovery followed routine experimentation along the lines previously disclosed. Id.

■ The invention of the respective claims in suit, appraised in the light most favorable to the patentee, embodies nothing more than an obvious combination of old elements. These elements had been in common use long prior to the advent of the patent, singly and in combinations similar to, if not identical with, those defined in the claims. Such combinations, in the absence of new and useful results, do not rise to the dignity of patentable invention. Bauer Bros. Co. v. Bogalusa Paper Co., 5 Cir., 96 F.2d 991; Standard Brands v. National Grain Yeast Corporation, supra; Grosjean v. Panther-Panco Rubber Co., 1 Cir., 113 F.2d 252; Dorr Co. v. Yabucoa Sugar Co., 1 Cir., 119 F.2d 521; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 6 Cir., 139 F.2d 473, certiorari granted 322 U.S. 719, 64 S.Ct. 1145.

The complete absence of invention seems to be further established by the conclusive evidence that persons other than the patentee, pursuing independent study and research, conceived a solution of the problem identical in substance with the one herein urged by the patentee in support of his claim to patentable invention. Julius Kayser & Co. v. Rosedale Knitting Co., 3 Cir., 98 F.2d 839, certiorari denied 305 U.S. 649, 59 S.Ct. 230, 83 L.Ed. 419; Himmel Bros. Co. v. Serrick Corporation, 7 Cir., 122 F.2d 740; Hazeltine Corporation v. General Motors Corporation, 3 Cir., 131 F.2d 34. This is competent proof, if further proof were needed, that the alleged discovery derived from the common knowledge of the art as a direct consequence of its development. Ibid.

Those who preceded the patentee expressed a difference of opinion as to the optimum of acidity, but this is not material. All of them, having disclosed the principle, conceded that an optimum of acidity, although more efficient, was not critical, provided, of course, that its range was well

[38] The patentee admits in his testimony that the optimum of acidity defined in the claims in suit was ascertained by a simple routine experiment in the mills of the defendant.

within the permissible limits of 4.0 pH and 6.5 pH. The pertinent disclosure of the patent differs from those of the prior art only in the range of the optimum therein defined. This is a trivial difference, involving nothing more than a change of degree, and is obviously insufficient to support the claim to patentable invention.

█ It may be conceded, for the purpose of present discussion, although the evidence does not support the concession, that the patentee's contribution is a "decided improvement" over the prior art. This fact, however, in the absence of equally important facts, will not support the claim to patentable invention. In the case of Hansen v. Slick, supra, 230 F. at page 633, the Circuit Court of Appeals for the Third Circuit stated: "Substantial advance, marked improvement, progressive steps in an art, however beneficial, are not in themselves evidence of invention. They are to be expected, and, as the art progresses, more engineering skill, more mechanical progress, but less invention, are naturally to be looked for. It is when skill and progress stop abreast of an obstacle that inventive genius intervenes and invents." These principles seem to be particularly applicable here.

█ It is the opinion of the Court that the claims in suit are so broadly drafted as to completely embrace an art which had been in common use in the paper industry long prior to the advent of the patent. These claims, if held valid, would enable the patentee to arrogate to himself a monopoly not contemplated by the patent laws, a monopoly which would stifle the normal development of the art as well as the progress of the paper industry. The manufacturer would be relegated to the use of inefficient methods which had been outmoded long prior to the advent of the patent.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscrimina'; creation of exclusive privileges tends rather to obstruct than to stimulate inventions. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438; see also Railroad Supply Cô. v. Elyria Iron & Steel Co., 244 U.S. 285, 293, 37 S.Ct. 502, 61 L.Ed. 1136.

### Claim 10 of '775

This claim is invalid also because of its failure to meet the requirements of R.S. § 4888, 35 U.S.C.A. § 33. The statute requires the inventor to define his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, * * * to make, construct, compound, and use the same," and, to *"particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."* (Emphasis by the Court.) This claim is invalid particularly because of its failure to satisfy the latter requirement.

The invention of claim 10 is therein defined as follows: "A method of sizing paper making fibres which consists in treating the fibres with a solution of sulphate of alumina *in such a manner that when a size is added to the paper stock chest, the size will react with the fibres more rapidly than it will with the solution.* (Emphasis by the Court.) This disclosure, construed in the light of the specifications of the patent, may be sufficiently instructive to enable persons skilled in the art to practice the method therein described, but, even when so construed, it fails to define "the limits of the monopoly asserted" with the required certainty.

"Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must

'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The' claims 'measure the invention.' * * * In a limited field the variant must be clearly defined." General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402.

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine. Congress has provided that a patent may be awarded only for a new and useful manufacture 'not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof.'" United Carbon Co. v. Binney Co., 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232.

 Strict adherence to the requirements of the statute should be demanded where, as here, the disclosure of the patent is but one of many similar disclosures in a crowded art.[39]

 It should be noted that at the conclusion of the trial the plaintiff, over the objection of the defendant, attempted to voluntarily withdraw claim 10 from suit. This may not be done under the circumstances existing in this case. The defendant, having filed a counterclaim invoking the determination of the issue of validity, is entitled to insist upon an adjudication. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

## Infringement

An assumption of validity, for the purpose of passing on the question of infringement, must be predicated upon a narrow construction of the patent. The respective claims of the patent, construed in the light of its specifications and the disclosures of the prior art, must be limited to the specific combination of expedients therein defined, to wit, first, "treating the paper making fibres with sulphate of alumina, allowing the fibres to absorb the alum" (sulphate of alumina) "until the pH of the solution is over 5"; and, second, "then treating the surface of the astringent fibres with a solution of rosin size." [40] Royer v. Coupe, 146 U.S. 524, 13 S.Ct. 166, 36 L.Ed. 1073. Any other construction would bring the claims into conflict with the specifications [41] and extend them beyond the necessarily narrow bounds of the patent.

 The invention, as thus defined in the claims, comprises two integral elements: The successive steps of the method, as distinguished from the chemical process, and, the operative principle of the chemical process. The failure to substantially follow this combination of elements, and in the manner prescribed in the patent, negatives infringement. Royer v. Coupe, supra; United States Glass Co. v. Atlas Glass Co., 3 Cir., 90 F. 724; Jensen-Salsbery Lab. v. O. M. Franklin Blackleg Serum Co., 10 Cir., 72 F.2d 15; Winget Kickernick Co. v. Sil-O-Ette Underwear Corporation, 2 Cir., 89 F.2d 635, certiorari denied, 302 U.S. 723, 58 S.Ct. 44, 82 L.Ed. 559; John Waldron Corporation v. Equitable Paper Bag Co., 3 Cir., 106 F.2d 724; Texas Co. v. Anderson-Prichard Refining Corporation, 10 Cir., 122 F.2d 829; United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 128 F.2d 104; Universal Oil Products Co. v. Globe Oil & Refining Co., 7 Cir., 137 F.2d 3, affirmed 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399. We must here determine which elements of the invention, if any, are employed in the ac-

---

[39] It appears from the record in this case that the present patentee is the holder of at least twelve patents covering as many modifications of the sizing process.

[40] The successive steps as defined in claim 3. The successive steps defined in the other claims are identical.

[41] "The new principle involved in this process is that the small amount of alum used is nearly all absorbed by the fibres *so that when the size solution is added* a substantial part of the size is precipitated on the *surface of the acidified fibre* and the balance is slowly reacted upon by the slight amount of alum remaining in solution. When the acidity is greater than above stated, *then the size is coagulated by the alum solution* and does not react with the astringent fibres." (Emphasis by the Court.)

cused process, and, if so employed, in what manner. The elements of the accused process must be separately examined and compared with the elements of the invention.

The very essence of the invention, aside from the operative principle of the chemical process embodied therein, resides in the sequence of steps: the introduction into the stock of *sufficient* aluminum sulphate *to coagulate the size,* followed by the introduction of the rosin size emulsion. The claims, construed in the light of the specifications, define only this sequence.

The accused process embraces three successive steps: first, the introduction into the stock of *sufficient* aluminum sulphate *to overcome the carbonates* present in the water; second, the introduction into the stock of the rosin size emulsion; and, third, the introduction into the stock of *sufficient* aluminum sulphate *to coagulate the size.* This succession of steps, upon a cursory examination, would appear to constitute an encroachment upon the sequence of steps embodied in the invention, but this is not the fact. The successive steps of the accused process, and in the combination and sequence employed by the defendant, are embodied in the common practice of the prior art.[42]

The *sizing process* employed by the defendant consists of but two steps,[43] the second and the third. We repeat them to emphasize the distinction: the introduction into the stock of the rosin size emulsion, *followed by* the introduction into the stock of *sufficient* aluminum sulphate *to coagulate the size.* This is a reversal of the sequence of steps defined in the claims. It cannot be seriously contended that this reversal of steps is employed as a subterfuge to avoid the charge of infringement because it clearly violates the specific teaching of the patent.

The second element of the invention, the operative principle of maintaining the degree of acidity in the stock, within predetermined limits, is utilized by the defendant in the accused process. The range of acidity employed by the defendant in each of its operations substantially coincides with those disclosed ·by the cited references of the prior art.

### Machine One

It appears from the plaintiff's proof that the degree of acidity in the stock during the sizing reaction is maintained within the predetermined range of 5.2 pH and 5.5 pH. It is our opinion, based upon the testimony, that this range is not accurate. The degree of acidity in the stock is within the approximate range of 4.5 pH and 5.5 pH; the maximum of acidity is produced immediately upon the introduction of the aluminum sulphate into the stock as it leaves the jordan chest. The plaintiff's proof clearly ignores the degree of acidity at this stage of the defendant's operation. The difference, however, is not material.

### Machine Two

It appears from the plaintiff's proof that the degree of acidity in the stock during the sizing reaction is maintained within the predetermined range of 4.7 pH to 5.2 pH. It is our opinion, based upon the testimony, that this range is not accurate. The degree of acidity in the stock is within the approximate range of 4.4 pH and 5.2 pH; the maximum of acidity is produced immediately upon the introduction of the aluminum sulphate into the stock as it leaves the jordan chest. The plaintiff's proof clearly ignores the degree of acidity at this stage of the plaintiff's operation. The difference, however, is not material.

### Machine Three

The range of acidity maintained in each of the operations carried out on Machine Three coincides with the respective ranges maintained on Machines One and Two.

It is evident that the optimum of acidity maintained by the defendant in its practice of the accused process, although not entirely within the range defined in the patent in suit, encroaches upon that range. It is equally evident, however, that this optimum of acidity substantially coincides with the exact ranges disclosed by the cited references, and particularly the disclosures of Shaw, Roschier and Joachim.

It is our opinion that there is not, as between the process of the patent and the accused process, the substantial identity which must be proved to establish infringement. The accused process follows the

---

[42] It is evident from the cited references that the initial step, the introduction into the stock of sufficient aluminum sulphate to overcome the carbonates present in the water, was old, as were the second and third steps.

[43] The initial step is not essential to the sizing process and may be eliminated. This is not true of the third step.

teachings of the earlier disclosures. It embraces nothing more than the combination of steps of the old process modified by the embodiment of the operative principle of maintaining the degree of acidity in the stock within predetermined limits. There surely can be no infringement under these facts. Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir., 105 F.2d 941; Comolite Corporation v. Davidovicz, 2 Cir., 111 F.2d 121.

The charge of infringement can be sustained only on a broad construction of the patent in suit, a construction, which, if adopted, necessarily invalidates the patent because of anticipation by and lack of invention over the disclosures of the prior art. Such a construction would accord to the invention a range of equivalents not contemplated by the patent.

### Patent No. '285

The claims of this patent, as heretofore stated in our introductory paragraph, cover further improvements in the art of sizing paper in the pulp, and particularly improvements on the inventions defined in earlier patents to the plaintiff. These claims, despite their striking similarity, are not identical in substance, and it, therefore, becomes necessary, for the purpose of discussion, to classify them according to the nature of their disclosures.

### Group One

Claim 2 is typical of this group in which we include, in addition to the said claim, claims 1, 4 and 10, quoted in the footnote.[44] The invention is therein defined as follows: "A method of sizing paper which comprises mixing a stream of size with a stream of slightly acidified pulp fibers; and before the size is coagulated, discharging the mixture into a chest containing pulp, precipitated size and alum, while additional alum is continuously added to said chest." The exact nature of the invention is not apparent upon a mere reading of this claim, but is com-

prehensible upon an examination of the claim in the light of the disclosure of the specifications.

"The process may be practiced by adding a *stream of sizing emulsion* or solution to the *stream of slightly acidified or neutral pulp* in a manner whereby these materials are mixed together *as they pass from the beater chest to the machine chest*. The alum solution is added *continuously to the machine chest* where it becomes diluted and mixed with *the stock and the precipitated size*. The sizing reaction is continuous inasmuch as the *mixture of size and paper stock are continually reacting in the machine chest* with the *mixture consisting of (1) acidified fibers, (2) acidified sizing precipitates and (3) diluted alum solution* made basic by its continuous reaction with the size.

"This is an entirely new sizing reaction to be made use of knowingly. It involves a *new combination of conditions* that can be maintained consistently and that is entirely independent of the existence of a Jordan in the paper mill, although the reactions should take place within certain limits. These limitations are that *the size must be mixed with the pulp without coagulation.* * * *. The reaction with the alum takes place in the undiluted stock *in the machine chest*. The size is not precipitated *directly by the fresh alum solution,* but by a partially *acidified mixture of fibers and precipitated rosin size and an alum solution* having a pH of over 4.

"More particularly, just *sufficient alum* or paper-machine water is added to the paper stock *in the beater* to remove all alkalinity from the fibers. *If they are already acidified by prior treatment, this is not required.*

"In carrying out my process, *the sizing is mixed with the pulp at some point in its continuous flow from the beater chest to the machine chest. The size emulsion is added in a continuous stream, after the*

---

44 "1. A method of sizing paper which comprises mixing a stream of size with a stream of non-alkaline pulp fibers; and before the fibers can absorb the alkali from the size, discharging the mixture into a chest containing pulp, precipitated size, and alum, while additional alum is continuously added to said chest."

"4. A step in a method of sizing paper which comprises adding a stream of paper pulp containing a mixture of slightly acidified pulp fibers and an alkaline

size solution, to a chest containing acidified fiber, precipitated size and an alum solution while additional alum is continuously added to said chest."

"10. A step in the method of sizing paper pulp which comprises mixing an aqueous stream of pulp fibers containing uncoagulated size with a stream of pulp fibers containing coagulated size, and alum and which is maintained at a pH of from 4 to 5.2 by the continuous addition of alum."

*stock leaves the beater chest.* * * *. The mixture of pulp and uncoagulated size is then discharged into the machine chest. *The alum for coagulating the size is discharged in a continuous stream into the machine or coagulation chest,* where it maintains the acidity required for the chemical reaction." (Emphasis by the Court.)

We have herein emphasized the limitations, the allegedly novel features, urged by the plaintiff in the prosecution of his application for the patent. It must be here observed that the patent issued only after the application had been twice rejected by the Patent Office on earlier patents to the plaintiff, and particularly No. 1,558,845, which was held invalid in the related suit. The plaintiff must, therefore, be held to a strict construction of the present claims, a construction within the limitations defined in the specifications.

The invention, as defined in the claim and explained in the specifications, embodies the following combination of steps: first, the introduction into the stock, at the beater, of sufficient aluminum sulphate "to remove all alkalinity from the fibers"; second, the introduction into the "slightly acidified" stock, "at some point in its continuous flow from the beater chest to the machine chest," of a "stream of sizing emulsion"; third, the discharge of this mixture "of pulp and uncoagulated size" into the machine chest; and, fourth, the introduction into the stock, at the machine chest, of a "continuous stream" of aluminum sulphate solution, sufficient to maintain the degree of acidity in the stock within predetermined limits. The first step is not required if, as stated in the quoted disclosure, the stock is "already acidified by prior treatment." [45]

The last two steps are carried out as concomitant operations, and, according to the teachings of the specifications, create the "new combination of conditions" conducive to the efficient coagulation of the size. The coagulation of the size under these conditions is effected in the *"machine chest,"* not by the solution of aluminum sulphate alone but by the mixture of "(1) *acidified fibers,* (2) *acidified sizing precipitates,* and (3) *diluted alum solution* made basic by its continuous reaction with the size."

### Prior Art

The patents and publications of the prior art, discussed and considered herein and in the related suit, are relevant and material to the issue of validity. Their pertinent disclosures have been extensively quoted and sufficiently discussed, and we see no reason to review them.

The normal development of the art led to several modifications of the original sizing process. These modifications, as we have already seen, comprised nothing more than simple and obvious adaptations of the process, an advance clearly indicated by the prior art and consistent with the progress of the paper industry.

The adaptation which we regard as particularly pertinent, embodied a combination of three successive steps: first, the introduction into the stock of *sufficient* aluminum sulphate *to overcome the alkalinity* of the stock; second, the introduction into the stock of the rosin size emulsion; and third, the introduction into the stock of *sufficient* aluminum sulphate *to coagulate the size.* This adaptation was disclosed long prior to the advent of the patent in suit, and has been in common use in many paper mills since its disclosure. [46]

This particular adaptation was disclosed by the present patentee as early as 1928. DeCew, The Sizing Process, The Manufacture of Pulp and Paper, [47] Copyright 1928. It is therein stated, Section 4, at page 41: "Size is usually introduced before the alum; but there are cases where so many injurious substances are present that the size suffers less injury by following the alum. In such cases, it is presumed that *an amount of alum sufficient to combine with the injurious substances is added in addition to the amount required for the*

---

[45] The sizing of sulphite pulp does not require the first step. Sulphite pulp is treated with an acid salt in the course of its preparation.

[46] See, in addition to the references heretofore cited, Clapperton, Practical Paper-Making, published in 1907; Lawrence, Sizing of Kraft Papers, Pulp and Paper Magazine, published in 1924; Britton, Hydrogen Ions, published in 1929.

[47] This reference, although not in evidence, is one of which the Court may take judicial notice. Werk v. Parker, 3 Cir., 231 F. 121, affirmed 249 U.S. 130, 39 S.Ct. 197, 63 L.Ed. 514. We reserve to the plaintiff the right to challenge the reference.

*size.* When very hard water must be used, or *where a considerable amount of alkali is in the paper stock,* it is advisable *to add enough alum to take care of the hardness, and neutralize the beater before the size is added.* In some mills, *the size is put in last,* just before letting the stuff into the chests, which gives very good results." (Emphasis by the Court.)

A further modification of this process, which we regard as pertinent, was employed in the sizing of sulphite pulp. It was generally recognized, and had been long prior to the advent of the patent in suit, that the sizing of sulphite pulp did not require the initial treatment with aluminum sulphate because of the acidity imparted to the pulp in its preparation. The initial step of the process hereinabove described, the acidification of the fibers, was inherent in the method followed in the preparation of the sulphite pulp, making the initial step of the sizing process unnecessary.

The disclosure of an earlier patent to the patentee, No. '845, embraces the latter adaptation. This patent contains the following instructions: "My method of operation is to add the rosin size to the beating engine and *coagulate it after it leaves the jordan by bringing an alum solution into contact with the stock in the pipes or machine chest.* I may also do all of the sizing in *a separate chest after the stock comes from the jordan."* (Emphasis by the Court.) The invention of this patent is sufficiently broad to permit its application to the sizing of either sulphate or sulphite pulp. If employed in the sizing of sulphite pulp, the initial step of the sizing process, the acidification of the fibers, is inherent in the method employed in the preparation of the pulp. The disclosure of this patent embraces the alternative recommended in the patent in suit.

The invention of this patent embodies also the concept of coagulating the size in the machine chest "by bringing an alum solution into contact with the stock in the * * * machine chest," an allegedly novel element of the invention of the patent in suit. This allegedly novel concept, however, was. disclosed not only by the present patentee but also by others [48] long prior to the advent of the patent in suit. The patents to Weygang and Munroe are apposite,

and we quote their pertinent disclosures, but without discussion.

Weygang, page 4, lines 17 to 24: "*Instead of completing the entire sizing operation in the beating engine* as described similar results are produced by passing the fibrous pulp *after the size has been added and thoroughly mixed* in the said beating engine *into another suitable apparatus* fitted with mixing arms or other contrivance capable of mixing the pulp without much friction and *adding the alum or other precipitating solution to the pulp in this apparatus."* (Emphasis by the Court.)

Munroe, page 2, lines 97 to 117: "In operation, paper mill waste or 'tailings' which consist of slivers and waste from a ground wood mill that are too large to go into paper, with the addition of knots and large slivers *from a sulphite* or other mill, is first ground down with a relatively small amount of water to the desired size of fiber. Any or all of these wastes may be used. * * *. After the material is of a desired size and consistency, *a proportion of ordinary rosin size * * * is run in and the material is thoroughly mixed. Aluminum sulphate is then run in and thoroughly mixed also,* which precipitates free rosin and aluminum resinate on each individual fiber. The material is then introduced into the felting machine. * * *."* (Emphasis by the Court.)

It will be observed that the Munroe process, as thus described, embodies the following combination of steps: first, the acidification of the stock, (sulfite pulp); second, the introduction into the stock of the rosin size emulsion; third, the introduction into the stock, thus treated, of the aluminum sulphate; and, fourth, the coagulation of the rosin size in the machine chest, or its equivalent, a separate mixing chest.

### Lack of Invention

It is our opinion that the successive steps of the invention, either singly or in combination, are devoid of novelty. These steps, independent of the "new combination of conditions" produced by their use in the manner described, were known, both singly and in combinations strikingly similar to that of the invention, long prior to the advent of the patent in suit. However, we rest our decision on the issue of

---

[48] Weygang Patent, Br.No. 7904, 1887; Annandale Patent, Br.No. 9106, 1888; Munroe Patent No. 1,335,909, 1920;

Klemm, Handbuch der Papierkunde, 1904.

validity on the lack of patentable invention, the more obvious and less doubtful ground.

The complete absence of patentable invention may be easily demonstrated by incorporating the respective novel features of the invention into each of the successive steps of the process of the prior art. This process, thus modified, with the novel features stated parenthetically, embodies the following combination of steps: First, the introduction into the stock (at the beater) of sufficient aluminum sulphate to remove all alkalinity from the fibers; second, the introduction into the stock (at some point in its continuous flow from the beater chest to the machine chest) of a (stream) of rosin size emulsion; third, the introduction into the stock (at the machine chest) of a (continuous stream) of aluminum sulphate solution sufficient to coagulate the size; fourth, the coagulation of the rosin size by the (mixture of acidified fibers, acidified sizing precipitates, and the solution of aluminum sulphate). It should be noted that the fourth step, as thus described, is not embodied in the prior art process but, for reasons which will presently appear, we have included it in our description as though it were.

The successive manipulative steps of the invention are apparently identical with the successive manipulative steps of the process of the prior art. The teachings of the patent are distinguished thus far from the disclosures of the prior art only in their recommendations that the sizing ingredients be introduced into the stock at specified points. This is not a patentable distinction, especially where, as here, similar recommendations are comprehended in earlier disclosures, and particularly the disclosure of Patent No. '845. There is clearly no patentable distinction, at least in this respect, between the disclosure of the latter patent and the patent in suit. See Patent No. '845, lines 50 to 56, hereinabove quoted.

It is our firm conviction that the alleged invention involved nothing more than the obvious adaptation of a previously disclosed sizing process to the continuous operation of the modern paper mill.[49] It cannot reasonably be held that this adaptation required anything more than the expected ingenuity of the person skilled in the art. The adaptation was clearly one that would readily occur to the skilled technician or engineer. The mere adaptation of an intermittent process to a continuous operation was not, under these circumstances, patentable invention.

The essence of the invention, according to the specifications of the patent, lies in two elements, to wit, "the continuous mixing of the size with the pulp before coagulation thereof under conditions which do not allow time for the free alkali in the size to be absorbed by the pulp fibers," and the coagulation of the size in the "machine chest" by the mixture of "acidified fibers, acidified sizing precipitates, and diluted alum solution." These elements must be separately considered.

The former element—"the continuous mixing of the size with the pulp before coagulation thereof under conditions which do not allow time for the free alkali in the size to be absorbed by the pulp fibers"—is obviously inherent in the sizing process of the prior art, on which the present invention is alleged to be an improvement. If there is introduced into the stock only "sufficient aluminum sulphate to remove alkalinity," the conditions thus produced will neither coagulate the size nor permit absorption by the fibers of the alkali in the rosin size emulsion. The acidified stock, having a hydrogen ion concentration of approximately 6.8 pH, and the rosin size emulsion, having a hydrogen ion concentration of approximately 8.0 pH, will not be sufficiently reactive to effect either result, the coagulation of the size or the absorption by the fibers of the alkali. The components will be so near neutrality that there will be little, if any, chemical reaction under normal operating conditions. There is nothing in this element of the invention to distinguish it from the initial step of the process of the prior art. The patentee may have perceived an advantage not heretofore perceived by others, but this neither enhances the claim to patentable invention nor detracts from the relevancy of earlier disclosures.

The latter element—the coagulation of the size in the "machine chest" by a mixture of "acidified fibers, acidified sizing precipitates, and diluted aluminum sul-

[49] See: Trimbey, Continuous Automatic Mixing System for Paper Stock, Technical Association Papers, Series III; Making Paper at Tuscaloosa, The Paper Industry, published in 1929; When Industry Comes, The Paper Industry, published in 1929; A Modern Board Mill, The Paper Industry, published in 1929.

phate"—may be novel but it is not of sufficient import to sustain the claim to patentable invention. This element is not truly a step in the process of the patent but a condition inherent in the particular adaptation by reason of the mere continuity of operation, "the new combination of conditions" upon which the patentee bases his claim to patentable invention. The successive steps of the process of the prior art, adapted to a continuous operation, will produce the same conditions: The "acidified fibers," previously treated with rosin size emulsion, will flow from the beater chest into the machine chest; the "acidified sizing precipitates" (in the stock) will flow with the stock from the headbox into the machine chest; and, "the diluted solution of aluminum sulphate" will flow from the reserve into the machine chest. It is evident that in any continuous operation in which the aluminum sulphate is introduced into the stock at the machine chest, the "new combination of conditions" will necessarily and unavoidably result.

It seems reasonably apparent that the invention of this patent, like that of '775, embodies nothing more than an obvious combination of old elements adapted to a continuous operation. These elements were known long prior to the advent of the patent, singly and in combinations similar to, if not identical with, those defined in the claims. Their adaptation to a continuous operation required nothing more than the expected ingenuity of the person skilled in the art. It has been held that such combinations, in the absence of new and useful results, do not rise to the dignity of patentable invention. See the cases hereinabove cited.

This patent combines the successive steps of '845 with the allegedly novel concept of '775. There is clearly no patentable invention in this combination of elements. Standard Brands v. National Grain Yeast Corporation, 3 Cir., 101 F.2d 814, affirmed 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17.

### Group Two

Claims 6 and 8 are substantially identical. The invention of these claims is defined in Claim 8, which is typical, as follows: "A method of sizing paper pulp which includes the continuous mixing of a sizing solution with paper making fibers that have been previously slightly acidified by treatment with a fresh alum solution and immediately coagulating the size by the continuous addition of alum."

It is evident, upon a mere reading of this disclosure, that it comprises nothing more than the successive steps of the old process, and in the combination heretofore disclosed by the prior art. The claims are, therefore, void because of anticipation by and lack of invention over the disclosures of the prior art.

### Infringement

The accused process comprises the following combination of steps: first, the introduction into the stock *at the beater* of sufficient aluminum sulphate to remove all alkalinity from the fibers; second, the introduction into the stock *at the machine chest* of the rosin size emulsion; third, the introduction into the stock, *as it is discharged into the secondary jordans,* of sufficient aluminum sulphate to coagulate the size; and, fourth, the coagulation of the size in the stock *as the stock flows through he secondary jordans to the paper machine.* This is obviously another adaptation of the sizing process heretofore disclosed and in common use long prior to the advent of the patent.

This process does not infringe the process of the patent. It is clearly distinguishable in several respects. The process of the patent, limited by the express language of the specifications, requires: First, the introduction of the rosin size emulsion into the stock as the stock flows "from the beater chest"; second, the introduction of the aluminum sulphate into the stock "at the machine chest"; third, coagulation of the rosin size in the stock "at the machine chest" by a mixture of "acidified fibers," "acidified sizing precipitates," and a solution of aluminum sulphate "continuously added" at the machine chest. The accused process follows none of these teachings.

It is urged by the plaintiff that the defendant infringes the particular modification of the process described in the specifications. This modification is described as follows: "There is another modification of this process that is also important, namely, in pumping the pulp stock from the machine chest to the headbox of the paper machine, there is generally an overflow of this undiluted pulp constantly being returned to the machine chest. Now, *if the alum solution added for the coagulation of the size is combined with this stream of stock returning to the chest* and it meets in the chest, the stream of pulp coming from the beater chest containing the size, there is no chance for variations in the

chemical reaction. *The alum is diluted with pulp where the chemical reaction is already complete* and just sufficient alum is used to maintain the pH of the solution desired for proper coagulation which is generally about 4.6 although it will operate within the limits given in this specification." (Emphasis by the Court.) The accused process does not follow this teaching.

■ The charge of infringement is sustainable only on a broad construction of the claims in suit, a construction consistent with claim 5 of the patentee's original application.[50] Such a construction, however, is precluded by the patentee's cancellation of the said claim upon its rejection by the Patent Office. I.T.S. Rubber Co. v. Essex Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335. "It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 61 S.Ct. 235, 239, 85 L.Ed. 132.

### Commercial Success

■ The claim to invention is supported by proof of the commercial success which followed the favorable reception of the patents by several paper manufacturers who accepted licenses thereunder. It appears, however, that under the license agreements, copies of which are in evidence, these manufacturers acquired the right to use not only the inventions of the patents in suit but also the inventions of numerous other patents held by the plaintiff. Under these circumstances it cannot be successfully urged that the commercial success upon which the plaintiff relies was exclusively ascribable, if at all, to the patents in suit. This is particularly true here because it appears from the undisputed testimony that inventions other than those of the patents in suit were embodied in the "sizing systems" installed by the plaintiff in the mills of the licensees. The proof is, therefore, of little or no value. See the opinion filed in the related suit, 57 F.Supp. 388, 399, 400.

### Breach of Contract

■ The plaintiff, in addition to his claim for infringement, asserts a claim for damages for breach of contract, which is predicated solely and entirely on the alleged breach of a certain license agreement. It is urged, in support of this claim, that the infringement was not only a violation of the duty imposed by law, independent of contract, but also a breach of an express obligation embodied in the said agreement. It is our opinion that the claim for damages for the breach of contract, as it is here asserted, is not consistent with the claim for infringement and must, therefore, be dismissed. See the opinion filed in the related suit, 57 F.Supp. 388, 401.

The dismissal of the claim for damages for breach of contract, however, does not rest on this ground alone. The agreement upon which this claim is predicated does not include either Patent No. '775 or Patent No. '285.

---

[50] "The method of sizing paper which comprises treating the fibers with a sufficient amount of alum to remove all alkalinity therefrom, but without sufficient excess of alum to coagulate size, continuously mixing a size with the pulp, and before the acidity within the fibers is neutralized by the alkali in the size coagulating the size by a continuous reaction with an alum solution."